Campbell, Chief Justice,
delivered the opinion of the court:
By the act of March 4, 1917, 39 Stat. 1195, jurisdiction is conferred on this court to render judgment for any balance that may be found due the Medawakanton and Wahpakoota Bands of Sioux Indians, “ otherwise known as Santee Sioux Indians,” upon certain indicated matters under the terms and provisions of the jurisdictional act. When this act was passed, the case of the Sisseton and Wahpeton Bands of Sioux, 42 C. Cls. 416, 208 U. S. 561, had been decided, and the act there involved and the court’s construction of it were therefore before Congress and were considered by its committees. This fact has additional significance when we find that some of the terms of the former act have been materially changed or are omitted entirely in the present act.
By a treaty of September 29, 1837, 7 Stat. 538, the Government agreed to set apart the sum of $300,000 and pay the interest thereon annually in perpetuity, the consideration of this agreement being the cession by the Indians of their lands east of the Mississippi River and all their islands in the river. The principal sum was accordingly held and the interest thereon at the rate of five per cent per annum, making an annuity of $15,000, was regularly paid to the Indians represented by plaintiff bands until the act of forfeiture in 1863, hereafter mentioned.
By a treaty of August 5, 1851, 10 Stat. 954, the Medawa-kanton and Wahpakoota bands ceded to the United States all claim to any lands in the territory of Minnesota and in the State of Iowa, and a reservation was set apart for them which is described in the treaty. The Government undertook, by this treaty, to provide a trust fund of $1,160,000, the interest on which, at five per centum commencing July 1, 1852, to be paid annually to the plaintiff bands for a period of fifty years, the payments to be in full discharge of the trust fund and interest at the end of the fifty years. The provision relative to the reservation above mentioned was stricken out by the Senate, and a provision was incorporated in lieu thereof whereby the Government agreed to pay ten cents per acre for the lands comprised with the 'reservation, and the amount thus realized was to be, and was in fact, *373 added to the trust fund mentioned, and bore interest, thereby increasing the annuity. The area involved was 690,000 acres. This at 10 cents per acre produced $69,000, to be added to the trust fund of $1,160,000, increasing it accordingly to $1,229,000, and creating an interest charge of $61,-450, which was practically paid to the Indians until the forfeiture act of 1868.
It was said by Judge Barney in the case of Sisseton and 'Wahpeton Indmnsy supra (p. 423) : “ In the year 1862 an outbreak of the Sioux Indians occurred, in which they committed terrible depredations and outrages upon the settlers in Minnesota, constituting one of the darkest pages in the history of Indian warfare. It is undisputed that at least a part of the claimant Indians were engaged in this outbreak and massacre, together with the Lower Sioux above mentioned. The Lower Sioux were, however, located nearer the white settlement, and for this reason probably a larger proportion of them participated in the outrages.” As appears from the preamble of the act itself, it was because of these outrages committed by the Indians that the forfeiture act of February 16, 1863, 12 Stat. 652, was-enacted. It abrogated and annulled the treaties that had been made with the four bands of Indians, or any of them, so far as any of them purported to impose “any future obligations on the United States,” and forfeited their lands and rights of occupancy within the State of Minnesota and all annuities and claims before that time accorded to any of them. A large part of the accrued annuities was also set apart, to be used by commissioners provided for in the act, in paying damages to persons suffering losses from the depredations of these Indians.
The payment of the annuities and interest under the two treaties of 1837 and 1851 with the plaintiff Indians thus ceased, but there were many subsequent acts appropriating money for the Santee Indians, and in the language of some of these appropriation acts there is an apparent recognition of the idea that at some time there might be a restoration of some of the annuities.
The jurisdictional act of March 4, 1917, with which we are now concerned is the first to give concrete expression to *374 the idea of restoration so far as affects the plaintiff bands of Indians. Its title is “An act for the restoration of annuities to the Medawakanton and Wahpakoota (Santee) Sioux Indians, declared forfeited by the act of February 16, 1863.” It does not in terms restore all the annuities, but provides a method of their settlement. The annuities provided by the treaty of 1837 were to be perpetual; and those provided by the treaty of 1851 and the additional sum added by a later enactment were to run for fifty years. The period for the latter had therefore expired when the jurisdictional act was passed. The direction of the act to render final judgment for any balance that may be found due the Santee Indians for any annuities ascertained to be due them under the treaties mentioned, “ as if the act of forfeiture of the annuities” had not been passed, would be a simple process, quite easy of solution but for the proviso that limits the annuities under the treaty of 1837 to the date of the judgment of the court, directing that against the ascertained amounts due the Indians there is to be set off “ all moneys paid to said Indians or expended on their account by the Government ” since the abrogation of the treaties. There is also a reference to the effect of the treaty of 1868 to be adverted to later, but not material in this connection. It is to be noted, however, that the language of the present act departs from that in the Sisseton and Wahpeton Indian case, supra, in a material way in the matter of set-offs. The earlier act provided that the set-offs should be “ all payments or other provisions of every name or nature made to or for said bands * * * which are properly chargeable against said unpaid annuities,” and this last clause was given construction by Judge Barney in the court’s opinion (pp. 426, 427). The present act requires us to debit the Indians with all moneys expended on their account as well as to take into consideration “ all equities and benefits received ” under the treaty of 1868 by these Indians.
One of the- first questions presented is the insistence by the Government that the principal sum of $300,000 contemplated by the treaty of 1837 is not to be taken into the account, and that the requirements of the act are met by *375 stating on the credit side of the account the unpaid annuities under the treaties mentioned. Referring to the punctuation in the act, the Government says that if the comma following the words “ not including interest ” had been omitted there would be no doubt that the meaning would be that neither interest nor the principal sum should be included, and that the presence of this comma “ does not make it certain that Congress intended” that the capital sum should be included as a credit. We are less concerned with what would have been intended if the punctuation had been different than we are with the act as passed, and while a history of the enactment on its passage through the two Houses seems conclusively to show that this comma was inserted to make a separation of the clauses, it is not essential in our view to place the meaning upon that fact alone. The purpose of the act is not alone to restore annuities. The restoration of them is limited, and a rule for a final settlement is stated. The restoration of them, if nothing else had been said or done, may very well have restored this principal sum, because the treaty of 1831 is for a perpetual annuity. The balance due the Indians for any annuities under and by virtue of the treaties would certainly involve the character of the annuities themselves and the period of their duration.
The Congress could have directed that the Indians be credited with the unpaid annuities to date of judgment, “ not including interest,” and omitted any reference to the principal sum, in which event we would take no notice of that sum, and therefore the mention of it in the act is significant of an intention to make a final settlement of the differences between the parties, and certainly the presence of a principal sum to produce an annuity forever is an important factor in such a settlement. If it had been intended to exclude this item of credit it would have been differently phrased and made to say “ not including interest or the principal sum.” The presence of the comma accentuates the meaning intended. The present value of the unpaid annuities without interest is to be found, which is the sum of them to the stated date, and there is to be added the capital sum of said annuity (act of 1837), “ which shall be in lieu of said perpetual *376 annuity.” It would seem also that in order to find the present value of an annuity in perpetuity the principal or capital sum is the only basis.
In accordance with these views we have credited the Indians with the unpaid annuities -without interest, giving them credit under the treaty of 1851 with the balance of the fifty payments stipulated for but discontinued by the act of 1863, and giving them credit with the unpaid annuities provided by the treaties of 1837, until the date of judgment, and further crediting them with the capital sum mentioned in the earlier treaty. The statement of account takes the form of credit and debit from the beginning of the treaties instead of commencing with 1863. This latter statement accounts for items 1 and 2 of the debits. As to the other items of debit, there is a wide difference between the parties, as shown by their briefs. The plaintiffs urge that few payments under the treaty of 1868 are to be accounted for, but we can not adopt that view. The reason for the insertion of the second proviso in the jurisdictional act is apparent when it is considered that the effect of the treaty of 1868 was to abrogate all former treaties, and it stood in the way of the allowance of annuities under the treaties of 1837 and 1851 as being due beyond 1868. The proviso takes care of this question by declaring that the treaty of 1868 shall not be a bar; but it further provides that all “ equities and benefits ” received under it shall be taken into consideration by the court. The words “equities and benefits” are not to be taken as limitations upon the meaning of “all monies paid to * * * or expended on ” behalf of the Indians, which the act requires us to set off against the amounts found due them, but they have full scope in the proviso itself. The treaty of 1868 is not a matter of defense for the Government, nor is it defensive matter for the Indians upon the question of moneys paid to them or on their account.
Item 3 is for expenditures for depredations committed by the Sioux Indians and for damages by troops. The appropriations for these items were regularly made and are clearly moneys expended on account of the Indians.
Item 4 is for the removal and support of the Indians under the acts of March 3, 1863, and June 25, 1864. One-half of *377 these expenditures, amounting to $91,226.35, is chargeable against plaintiffs if they should be charged with the cost of their removal. The evidence fails to show the exact proportion applicable to the different items. The question is not free from doubt, but in view of the ruling upon a similar question in the Sisseton case, supra (p. 430), we think the cost of removal should be borne by the Government. We have concluded that the cost of their support should be charged against the Indians, and as this amount would be at least equal to if it does not exceed the cost of removal we have divided the item equally and charged the Indians with one-half of the entire cost of removal and support.
Item 5 is for expenditures for support, clothing, and general incidental expenses of tíre Indians from appropriations made by certain acts mentioned in Findings IX, XII, and XIY, and are charged against the plaintiffs as amounts expended on their account.
Item 6 is a charge against the Indians on account of payments‘to traders affected by the outbreak of 1862. The principal amounts involved in these payments is made a charge against the annuities by the terms of the appropriation act, 23 Stat. 344, and one-lial'f of the appropriation of $375, 21 Stat. 431, is also chargeable against them. The Government insists that there should also be a charge of $42,086.93 comprised of payments made on account of debts of the Indians. A corresponding item was claimed against the Indians in the Sisseton case (p. 431) and was rejected. It further appears, however, that the appropriation to make these payments was made in 1874, 18 Stat. 47, and the amount authorized was $70,000. Its purpose is stated in the act to be to discharge obligations of the United States arising under the treaty of 1858 “ and from the diversion * * * of the funds and assets of the Indians” in the Government’s control “ applicable to that purpose.” The $70,000 thus appropriated is not a charge against the Indians, in view of the statement in the act that their funds applicable to a stated purpose had been diverted, the Government assuming the obligation.
Item 7 is for payments of scouts and soldiers and is conceded by the plaintiffs in this case.
*378 Item 8 involves an expense on account of the Indians which is explained as follows: These Santee Indians had been removed to the Crow Creek Reservation in 1863, but because of some dissatisfaction they were allowed to remove to a reservation set apart in February, 1866, at the mouth of the Niobrara River. They removed in May and June, 1866. Some settlers were upon these lands before the reservation was set apart. The item under consideration was appropriated for “ as damages sustained by citizens of Niobrara Township ” by the Government’s action “ in moving the Santee Indians upon their lands in 1866.” “ Their lands ” referred to the lands of the settlers, as the Indians had no lands in that vicinity. The payment was made on account of the Indians. Correlated with this item are two claims of debit insisted upon by the Government, (1) the value of lands in the Niobrara Reservation, and (2) the appropriation of $32,000 to purchase lands to restore the amount of acreage necessary to allotments to the Indians. The original reservation contained over 115,000 acres. This had been reduced by restoration to public domain, so that there remained about 73,000 acres, which were insufficient to admit of the allotment to the several Indians of lands, as was contemplated by the act of March 3,1863, by which the President had been authorized and directed to set apart for the Indians a tract of unoccupied lands “ sufficient in extent to enable him to assign to each member 80 acres of good agricultural land,” 12 Stat. 819. It thus appears that while the lands in the original reservation were sufficient to carry out the purposes declared in this act, they had been reduced in amount, and it became necessary to restore the amount of acreage.
The Government is not entitled to charge the Indians with the sum required to replace this acreage. The act of 1863 required the 80 acres of land to be assigned to the several Indians, and the latter were not responsible for the restoration of part of the reservation to the public domain. We are of opinion that the claim of $31,700.14 can not be maintained. Similar considerations forbid the charge against the Indians of the value of the 73,000 acres in the reservation. It is insisted upon by defendant and is apparently con *379 ceded by plaintiff’s brief, but the jurisdictional act does not include such items and the reservation was set apart because of the act of 1863.
Item 9 contains appropriations for bridges. We have charged the Santees with the cost of bridges on their reservations. The larger part of the appropriation was expended upon a bridge across the Niobrara Eiver, which did not connect with the Santee lands. These were some miles away.
Item 10 comprises the amounts shown by the annual appropriations and expenditures (not above included) on account of the Santees from 1870 to 1921. This does not include the apportionment of over $180,000 to the Santees under the act of 1889, 25 Stat. 888. Under our understanding of the jurisdictional act these expenditures being on account of the Indians are proper charges against them. The Government by this act is restoring annuities as well as the present value of the same, and as has been stated its plain purpose is to have a settlement of matters. The proviso relative to the treaty of 1868 would authorize the court to charge the Indians with amounts paid for them under the scope of “ equities and benefits,” but the specific requirement is that they be charged with moneys paid to them or on their account. Only by thus debiting the Indians can the final settlement contemplated by the jurisdictional act be consummated.
Our conclusion is that the plaintiff Indians are entitled to recover the sum of $386,597.89. And it is so ordered.
Graham, Judge; Hat, Judge; Dowhet, Judge; and Booth, Judge, concur.