The UNITED STATES, Appellant,

v.

The SIOUX TRIBE et al., Appellees.

The YANKTON SIOUX TRIBE, Appellant,

v.

The UNITED STATES, Appellee.

Appeal Nos. 4–78, 6–78.

United States Court of Claims.

Feb. 20, 1980.

---

Craig A. Decker, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for United States.

Arthur Lazarus, Jr., Washington, D. C., for appellees. Fried, Frank, Harris, Shriver & Kampelman, Marvin J. Sonosky, Sonosky, Chambers & Sachse, and William Howard Payne, Washington, D. C., of counsel.

Charles A. Hobbs, Washington, D. C., for appellant. Angelo A. Iadarola, Washington, D. C., atty. of record. Frances L. Horn, John Michael Facciola, and Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

### ON APPEALS FROM THE INDIAN CLAIMS COMMISSION

FRIEDMAN, Chief Judge.

These two consolidated cases are on appeal from decisions of the Indian Claims

Commission concerning compensation for lands the United States acquired pursuant to a treaty with the Sioux Nation signed on April 29, 1868. 15 Stat. 635. The treaty effected the cession of a large part of the land the Sioux owned in North and South Dakota, Nebraska, Wyoming, and Montana. It also established a reservation for the Indians and obligated the United States to provide services and goods, and to make payments to the Sioux.

In the first stage of this litigation, the Indian Claims Commission determined what interest the Indians had in the ceded lands. *Sioux Tribe v. United States,* 24 Ind.Cl. Comm. 147 (1970), *aff'd in part,* 500 F.2d 458, 205 Ct.Cl. 148 (1974). In the second stage the Commission found that the value of the land at the time of cession in 1869 was $45,685,000. *Sioux Tribe v. United States,* 38 Ind.Cl.Comm. 469 (1976). The Commission then ruled that the United States could not deduct any of the statutory offsets (see below) from the award, and awarded the plaintiffs $43,949,700. *Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 214, 257 (1978). The appeal in No. 4–78 is by the United States from the Commission's decision barring any offsets against that award.

The other appeal, No. 6–78, is by the Yankton Sioux, one tribe in the Sioux Nation, from an earlier Commission determination that the Yankton Sioux are entitled to only 7 percent of the total award. *Sioux Nation v. United States,* 41 Ind.Cl.Comm. 160 (1977).

We reverse the Indian Claims Commission decision in No. 4–78 and uphold the decision in No. 6–78.

### I. NO. 4–78

A. Paragraph 3 of the Indian Claims Commission Act, 25 U.S.C. § 70a (1976), provides that "[i]n determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim." The Indian Claims Commission ruled and the Sioux here argue that the amounts the United States paid to the Indians pursuant to the 1868 treaty were not "payments . .

on the claim," so that none of the payments should be offset in determining the amount of the Sioux's recovery. The rationale for this conclusion is as follows: The 1868 treaty was not a treaty ceding land but a peace treaty. The payments the United States made and the goods and services it provided pursuant to this treaty therefore were made in return for the peace the Sioux undertook to maintain rather than the land the Sioux ceded. Since the claim of the Sioux in this case is that they received an inadequate amount for the land they ceded by the 1868 treaty, those payments were not "on the claim."

The critical inquiry, therefore, is the character of the 1868 treaty: Was its basic purpose and effect the termination of hostilities between the Sioux and the United States and the maintenance of peace between them? We conclude that the treaty cannot be so characterized. To the contrary, the language of the treaty, the history of its negotiation, and the provisions of similar treaties negotiated with other Indian tribes at the same time indicate that the Sioux treaty was in major part a treaty of cession. Thus, the payments the government undertook to make and the goods and services it undertook to supply to the Sioux were, at least in substantial part, compensation for the land the Indians ceded to the government. *Nez Perce Tribe v. United States,* 24 Ind.Cl.Comm. 429, 432 (1971). The government accordingly is entitled to show which of the payments made and goods and services provided under the treaty were "payments . . . on the claim" that are to be offset against the award.

■ 1. After providing in Article I for the cessation of war and the maintenance of peace, Article II of the treaty established a reservation for the Sioux "set apart for [their] absolute and undisturbed use and occupation . . .." In turn, the Sioux agreed that, "henceforth they will and do hereby relinquish all claims or right in and to any portion of the United States or Territories, except such as is embraced within the limits aforesaid, and except as hereinafter provided."

In Article XI the Sioux, "[i]n consideration of the advantages and benefits conferred by this treaty and the many pledges of friendship by the United States . . . stipulate[d] that they will relinquish all right to occupy permanently the territory outside their reservation," but the Indians "reserved the right to hunt" on certain lands outside the reservation "so long as the buffalo may range thereon in such numbers as to justify the chase." In the same article, the Indians agreed to withdraw their opposition to the construction of railroads and military posts on the land outside the reservation, and to refrain from attacking, capturing, or killing white emigrants.

Article XV stated that after certain buildings had been constructed on the reservation, the Indians would regard the reservation as their permanent home and would "make no permanent settlement elsewhere," although they retained the right to hunt as stated in Article XI.

Article XVI provided that another tract of the Sioux land would be held and considered as "unceded Indian territory," upon which no white people were to settle and over which no white persons were to pass. The United States agreed to abandon its military posts in that area and to close the roads leading to them and to white settlements in Montana.

These provisions show that the cession of land was a major purpose and effect of the treaty. In Article II the Sioux explicitly "relinquish[ed] all claims or right in and to any portion of the United States or Territories" outside the reservation. In Article XI they similarly "relinquish[ed] all right to occupy permanently the territory outside their reservation," and in Article XV they agreed to "make no permanent settlements" except on the reservation.

The qualifying language in Article II "except as hereinafter provided" refers to the provision in Article XI by which the Sioux retained certain hunting rights, and the provision in Article XVI treating other land as "unceded Indian land." The exception makes it clear that the cession of all land outside the reservation does not include the latter two interests that the Sioux retained. Indeed, the reference to "unceded Indian land" in Article XVI is inconsistent with the argument that the treaty was not one of cession. The provision that under the treaty certain land would be "unceded" necessarily indicates that other land was being ceded.

Articles II, XI, and XV each provided specified consideration for the particular land cessions there described. In Article II the United States guaranteed that the Indians would have exclusive undisturbed use and control over the reservation lands in return for which the Indians relinquished the other lands. Article XI stated that the Sioux were relinquishing the right permanently to occupy land outside the reservation, "[i]n consideration of the advantages and benefits conferred by this treaty and the many pledges of friendship by the United States"—which also included the recognition in that article of the Indians' right to hunt outside the reservation. In Article XV the Sioux agreed that when the United States had built certain facilities on the reservation, as promised in Article IV, the Indians would make their permanent homes there, thereby giving up the occupancy of land outside that area.

The Sioux argue that because they were a nomadic people, they gave up nothing when they relinquished their right to settle permanently outside the reservation but retained their right to hunt. Although the Sioux were concerned in the treaty negotiations with retaining and protecting their hunting rights, they also wanted to remove and exclude the white people from their lands entirely. See the discussion below.

Like all treaties, the Sioux treaty of 1868 was a compromise. The Sioux obtained a reservation for their exclusive undisturbed use, retained the right to hunt on other lands as long as those lands had sufficient game, and would receive various payments, goods, and services from the United States. In return, they ceded substantial portions of their land to the United States. Although the treaty also provided in Article I that war between the parties would cease and

that both sides would keep the peace, the treaty cannot properly be viewed as solely or even primarily a peace treaty. Its various provisions show that in major part it was a treaty of cession.

2. The background of the treaty and the negotiations leading to it support the conclusion that it was a treaty of cession.

In the 1860's, following the discovery of gold in Montana, white settlors began to emigrate across Sioux lands. Their primary route was along the Powder River Road, in the heart of the Sioux hunting lands. The disruptions caused by white emigrants led to disputes and eventually to the establishment of forts by the United States to protect the road. The Sioux reacted to the Army presence by waging war, in which they were highly successful.

The United States concluded it had two options: to fight a long and costly war or to try to make peace. It chose the latter course and appointed an Indian Peace Commission. 15 Stat. 17 (1867).

The primary concern of the United States was insuring the safety of white emigrants, but a peace treaty alone was not thought adequate to accomplish that objective. During the discussions leading up to appointment of the commission, it was repeatedly stated that the Indians would have to be moved onto a reservation. *See, e. g., Sioux Tribe v. United States,* 42 Ind.Cl. Comm. 214, 236–40 (1978) (findings of fact 65, 70, 73). The statute establishing the Peace Commission, moreover, included as one of the goals of the mission the selection of an appropriate site for a permanent Indian reservation located away from highways and railroad routes. Section 2, 15 Stat. 17.

The record of the negotiations between the commission and the Sioux shows that the Indians did not want to give up their land, and that on occasion government representatives told the Indians they would not have to do so. On the other hand, the major concern of the Sioux was that they be permitted to continue to hunt as long as the game remained, and the commission promised that they could do so, as the treaty provided in Article XI. *See, e. g., Sioux,*

*supra,* 42 Ind.Cl.Comm. at 246–51 (findings of fact 86, 87, 89). General Sanborn, a member of the commission, twice told the Sioux that the United States was asking them only that they "surrender" "such lands as no longer afford you any game." Plaintiffs' Statement of Facts to the Indian Claims Commission, pp. 152–53, 155, 157.

The Sioux in 1868 may not fully have understood the white man's concept of land ownership, and as a nomadic people they may have thought that they continued to "own" land as long as they could hunt on it. The statements by commission members that the Indians would not have to give up their land may have been intended only to inform the Indians that they could retain their hunting rights, and the Sioux could have so understood the statements. The treaty, however, distinguished among three categories of Sioux land: (1) the reservation, which was set apart for the Indians' "absolute and undisturbed use and occupation" and which would become their permanent home; (2) land that was "unceded"; and (3) land upon which the Sioux retained hunting rights as long as the game remained—a category that was different from the "unceded" land.

The Peace Commission Report shows that translators fully explained the terms and provisions of the treaty to many leaders of the Sioux. For example, Red Cloud, one of the Sioux chiefs, required three days of explanation before he would sign. Considering all the circumstances, it cannot be concluded that the Sioux were unaware when they signed the treaty that they were ceding to the United States a significant portion of their land or that they believed that the money payments the United States agreed to make and the goods and services it undertook to provide were not in return for the land they were surrendering. As Red Cloud complained when he did not receive all of the goods promised to him in the treaty, "They held out a paper for me to sign and that is all I got for my land." Plaintiffs' Statement of Facts to the Indian Claims Commission, pp. 152–53.

3. The treaty between the Sioux and the United States was one of a series of agreements negotiated by the same commissioners with Indian tribes in the late 1860's.[1] Although none of the other treaties was identical to that the Sioux signed, each contained the same pattern of provisions found in the Sioux treaty. Each begins with mutual pledges of peace. A reservation is then described and set aside for the undisturbed use of the Indians, and all or most of the group's other land claims are relinquished. Next follows a series of sections describing the benefits the Indians will receive and the goods and services the United States will provide. Finally, each treaty recites that no reservation land will be ceded to the United States unless three-fourths of all adult males on the land agree.

The Indian Claims Commission has interpreted four of these agreements as treaties of cession. *Navajo Tribe v. United States,* 23 Ind.Cl.Comm. 244 (1970) (interpreting 15 Stat. 667); *Cheyenne-Arapaho Tribes of Okla. v. United States,* 10 Ind.Cl.Comm. 1 (1961) (interpreting 15 Stat. 655 and 15 Stat. 593); *Crow Tribe v. United States,* 6 Ind.Cl.Comm. 98 (1958) (interpreting 15 Stat. 649). A case based upon a fifth treaty was settled, but the settlement recognized that the treaty ceded land and included offsets against the claim. *Shoshone-Bannock Tribes v. United States,* 19 Ind.Cl. Comm. 3 (1968) (interpreting 15 Stat. 673). There is no convincing reason why the Sioux treaty should be viewed differently.

The grounds upon which the Commission and the Indians seek to distinguish those other treaties from the Sioux treaty are unconvincing as a basis for viewing the Sioux treaty alone as one of peace rather than of cession. The Commission differentiated the Crow and Shoshone/Bannock treaties on the ground that because the latter tribes were already at peace with the United States those treaties necessarily

were not treaties of peace. Those agreements, however, contained the same mutual pledges of peace as Article I of the Sioux treaty.

These pacts and the Sioux treaty differ from treaties strictly for peace, such as an earlier agreement with the Navajo. Treaty Between the United States of America and the Navajo Tribe of Indians, *proclaimed* Sept. 24, 1850, 9 Stat. 974. That treaty did not include any cession of land and therefore was intended solely to promote amicable relations between the Navajo and the government. The parties did not specify any payments to be made under the agreement; rather they provided, in Article X, for "such donations, presents, and implements . . . as [the] government may deem mete and proper." The later series of treaties, including the Sioux treaty, on the other hand, ceded Indian interests in land and provided for payments to the Indians in consideration of the treaty concessions.

Another asserted distinction is that only the Sioux treaty contains the phrase "except as hereinafter provided" after the language in Article II establishing a reservation and relinquishing all rights to lands outside it. Elsewhere in the Crow and Shoshone/Bannock treaties, however, the Indians retained the right to hunt and even to settle, although not permanently, outside the reservation. Article IV, 15 Stat. 649; Article IV, 15 Stat. 673. Similar hunting and temporary residency rights were granted in all of the treaties. The Kiowa/Comanche Cheyenne/Arapahoe, and Navajo treaties, moreover, contain no blanket relinquishment of rights in the provision creating a reservation.

The phrase "except as hereinafter provided" in the Sioux treaty refers to the other provisions in the treaty relating to land, as explained in section 1, *supra.* It merely eliminated a possible ambiguity present in the other treaties. All of the treaties, in-

---

1. Treaty with the Eastern Band of Shoshones and Bannock Tribe, *proclaimed* Feb. 24, 1869, 15 Stat. 673; Treaty with the Northern Cheyenne and Northern Arapahoe Tribe, *proclaimed* Aug. 25, 1868, 15 Stat. 655; Treaty with the Kiowa and Comanche Tribes, *proclaimed* Aug. 25, 1868, 15 Stat. 581; Treaty with the Cheyenne and Arapahoe Tribes, *proclaimed* Aug. 19, 1868, 15 Stat. 593; Treaty with the Navajo Tribe, *proclaimed* Aug. 12, 1868, 15 Stat. 667; Treaty with the Crow Tribe, *proclaimed* Aug. 12, 1868, 15 Stat. 649.

cluding the Sioux, (1) established a reservation for exclusive use of the Indians, (2) granted hunting and temporary occupancy rights outside the reservation, and (3) relinquished all rights of the Indians in their land, except those granted in the agreement.

■ The one major difference between the Sioux treaty and the others is Article XVI, designating a portion of the Sioux lands as "unceded Indian territory." Since this provision does not appear in the other treaties, that may be a reason for the "except as hereinafter provided" language in Article II of the Sioux pact. Moreover, as explained in section 1, *supra,* the reference to "unceded" Indian land is a clear indication that elsewhere in the treaty the Sioux did cede other portions of their territory.[2]

■ B. In addition to providing for deductions from the award to reflect "payments . . . on the claim," paragraph 3 of the Indian Claims Commission Act authorizes the Commission to

> inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant . . ..

25 U.S.C. § 70a (1976). Although the Commission has considerable discretion to determine whether to allow gratuitous offsets, that determination must reflect the "entire course of dealings" between the United States and the Indians. In granting the Sioux's motion to bar any consideration of gratuitous offsets, the Commission ignored that requirement, and its decision cannot stand. *Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 214, 231–32 (1978).

The ground upon which the Commission denied any gratuitous offsets was that the actions of the United States between 1875 and 1877 in connection with its acquisition of the Black Hills from the Sioux "were grossly dishonorable." *Id.* at 232. After describing those actions, which we summarized in *United States v. Sioux Nation,* 518 F.2d 1298, 207 Ct.Cl. 234 (1975), *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), the Commission stated that those events "so taint the course of dealings between the United States and the Sioux that we cannot in good conscience offset any gratuitous expenditures by the United States against any Sioux award in this docket." *Sioux Tribe, supra,* 42 Ind.Cl. Comm. at 232.

The events involved in this case cover a much longer period than the 3 years upon which the Commission exclusively focused. The treaty itself was negotiated and ratified in 1868 and 1869; its background goes back a number of years before that; and the payments that the government wants to treat as gratuitous offsets were made well into the twentieth century.

■ This court has stated that the government is entitled to gratuitous offsets if the entire course of dealings between it and the Indians warrants such action. *United States v. Cherokee Nation,* 474 F.2d 628, 638, 200 Ct.Cl. 583, 600 (1973); *United States v. Emigrant New York Indians,* 177 Ct.Cl. 263, 287 (1966); *Sioux Tribe of the Lower Brule Reservation v. United States,* 315 F.2d 378, 380, 161 Ct.Cl. 413, 416, *cert. denied,* 375 U.S. 825, 84 S.Ct. 66, 11 L.Ed.2d 57 (1963). In the present case, the Commission did not examine the entire course of dealings between the United States and the Sioux but instead considered only the dealings in the relatively brief period 1875–77. The Sioux already have been awarded full

**2.** The Sioux cite a finding of this court in *Medawakanton Indians v. United States,* 57 Ct.Cl. 357, 370 (1922), that under the 1868 treaty "[t]here were no lands ceded by the Indians to the United States." In *Quick Bear v. Leupp,* 210 U.S. 50, 80, 28 S.Ct. 690, 698, 52 L.Ed. 954 (1908), which the defendant cites, the Supreme

Court stated that under that treaty "the Indians made large cessions of land and other rights." To whatever extent such statements are significant, the Supreme Court's views, of which we may not have been aware in the *Medawakanton* case, are entitled to greater weight.

compensation for the government's improper action in those years in taking the Black Hills from them. *Sioux Nation v. United States,* 220 Ct.Cl. ——, 601 F.2d 1157 (1979), *cert. granted,* —— U.S. ——, 100 S.Ct. 519, 62 L.Ed.2d 418 (1979).

Paragraph 3 of the Indian Claims Commission Act does not permit the Commission to deny gratuitous offsets solely on the basis of a relatively small portion of the total dealings between the United States and the Indians. Consideration of the entire course of dealings might have led the Commission to conclude that gratuitous offsets should be allowed. The present case, therefore, is unlike *United States v. Assiniboine Tribes,* 428 F.2d 1324, 192 Ct.Cl. 679 (1970). There we upheld the Commission's denial of gratuitous offsets where the Commission stated that its decision was based "upon review of the entire course of dealings between the parties . . . ." *Assiniboine Tribe of Indians v. United States,* 21 Ind.Cl.Comm. 310, 312 (1969).

C. Since we conclude that the Commission erred in refusing to consider reducing the award by any payments on the claim or gratuitous offsets, the case must be remanded to the Trial Division to determine whether the award should be reduced. In so doing, we do not indicate any view on the application of particular payments to the cession of particular lands, or on the extent, if any, to which the award should be reduced. Those are matters for the trial judge to determine in the first instance. We hold only that the Commission erred in totally barring consideration of those items.

## II. NO. 6–78

The Teton Sioux Tribe and the Yankton Sioux Tribe are two tribes of the Sioux Nation that had an interest in the Sioux lands for which the Commission made the award in this case. The Yankton Sioux appeal in No. 6–78 challenges the Commission's determination that the Yanktons had only a 7 percent interest in those lands, and therefore are entitled to 7 percent of the award.

In an earlier decision in this case, the Commission concluded that since both the Tetons and the Yanktons had recognized title to the land involved, their respective interests in the land should be determined on the basis of the populations of the two tribes. This calculation gave the Yanktons a 17 percent interest in the land and the Tetons an 83 percent interest. *Sioux Nation v. United States,* 24 Ind.Cl.Comm. 147, 158 (1970).

On appeal, we stated that "[t]he formula for assigning the interests on a total population basis . . . may not be appropriate in this instance," since "comparing the total population of the two divisions of the Sioux treats the Yanktons as if they all were using the Fort Laramie land, when, in fact, only a portion of the Yankton Sioux may have actually used this territory." *Sioux Tribe v. United States,* 500 F.2d 458, 467, 205 Ct.Cl. 148, 167 (1974). We stated that "the best method for determining the respective interests of the Tetons and the Yanktons in the Fort Laramie land is by assigning the interests on the basis of the number of Tetons and Yanktons who actually used and occupied the land." *Id.* Our disposition of this case was as follows:

We remand this portion of the case to the Indian Claims Commission to determine whether there is sufficient evidence of actual use to apportion the land on the basis of the comparative population of the Teton and Yankton divisions of the Sioux actually using the Fort Laramie land. If there is sufficient evidence, the apportionment should be made on that basis. On the other hand, if the parties are unable, after being given a reasonable opportunity to do so, to produce sufficient evidence to enable the Commission to apportion the interests in the land on that basis, the apportionment previously made by the Commission in its order of December 2, 1970, will be acceptable. *Sioux Tribe, supra,* 500 F.2d at 469, 205 Ct.Cl. at 170.

Following the remand, the Commission initially adhered to its apportionment of 17 percent to the Yanktons and 83 percent to the Tetons. *Sioux Nation v. United States,* 40 Ind.Cl.Comm. 454 (1977). It stated that

although the evidence showed that a "far greater" number of Tetons than Yanktons used the area, it was "unable to discover what approximate number of each sub-tribe this represents." *Id.* at 474. It concluded that "since we are unable to determine the number of Tetons and Yanktons actually using and occupying the Sioux-Fort Laramie lands, under the remand order of the Court of Claims we are compelled to adopt that apportionment previously made by this Commission in our order of December 2, 1970." *Id.* at 475.

On the Tetons' motion for rehearing, on which it heard oral argument, the Commission vacated its prior order and ruled that the Yanktons had a 7 percent interest and the Tetons a 93 percent interest. *Sioux Nation v. United States,* 41 Ind.Cl.Comm. 160 (1977). It stated that its prior decision "was based on too narrow a reading of the mandate of the Court of Claims," which it had interpreted "as requiring us to determine from the evidence the exact numbers of Tetons and Yanktons which were using the . . . land." *Id.* at 164. The Commission stated that "[a] careful rereading" of the decision of this court "indicates that the court did not expect such an exact determination by the Commission" and that the mandate would be satisfied by "[a] determination of the comparative populations of the two groups using the land, or the percentage of the total population of each group using the land." *Id.*

The Commission "reexamined the record" and concluded that the findings in its initial decision on remand "are sufficient for us to determine the approximate percentage of each Sioux group that was using the Sioux-Fort Laramie lands." *Id.* "Upon weighing the evidence, including contemporary sightings and reports, and the testimony of the expert witnesses, the Commission is of the opinion" that approximately 25 percent of the Yanktons "used and occupied the land." *Id.* at 165. Applying this percentage to the total population of the various Sioux groups, the Commission concluded that the Yanktons had a 7 percent interest in the land. *Id.* at 165–66.

It is a well established principle that an administrative agency may reconsider its own decisions. "The power to reconsider is inherent in the power to decide." *Spanish Int'l Broadcasting Co. v. FCC,* 128 U.S.App.D.C. 93, 99, 385 F.2d 615, 621 (D.C. Cir.1967) (quoting *Albertson v. FCC,* 87 U.S. App.D.C. 39, 41, 182 F.2d 397, 399 (D.C.Cir. 1950)); *accord, Dayley v. United States,* 169 Ct.Cl. 305, 308 (1965). Pursuant to its statutory authority (25 U.S.C. § 70h) to establish rules of procedure, the Indian Claims Commission provided in Rule 33 of its General Rules of Procedure that any party may seek reconsideration within 30 days of a final Commission determination. 25 C.F.R. § 503.33(a) (1979). The decision to grant or deny rehearing lies within the agency's discretion, and "[o]nly a showing of the clearest abuse of discretion could sustain an exception to that rule." *United States v. Pierce Auto Freight Lines,* 327 U.S. 515, 535, 66 S.Ct. 687, 697, 90 L.Ed. 821 (1946); *cf. Interstate Commerce Commission v. Jersey City,* 322 U.S. 503, 515, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420 (1944).

The stated basis upon which the Commission granted rehearing in this case is unconvincing. The statement in the second opinion that in its first decision the Commission had interpreted our decision as requiring it to determine "the exact number" of Tetons and Yanktons who used the land seems inconsistent with the statement in the Commission's first opinion that the agency could not determine "what approximate number" of Tetons and Yanktons "actually" used and occupied the land. But despite the dubiety of the Commission's articulated reason for granting rehearing and whatever may be the real explanation for that action, we cannot say that in granting rehearing the Commission abused its discretion.

On granting rehearing the Commission vacated its earlier order. Our function on this appeal is not to second-guess the Commission's decision to rehear, but to determine whether its new decision rendered on rehearing itself is supported by substantial evidence. *Confederated Tribes of Warm Springs Reservation v. United*

*States*, 177 Ct.Cl. 184, 192, 193, 195 (1966). Our review of the record leads us to conclude that substantial evidence supports the Commission determination that the Yankton Sioux had a 7 percent interest in the land. We therefore affirm the Commission's order on that point.

## CONCLUSION

In No. 4–78, the decision of the Indian Claims Commission is reversed, and the case is remanded to the Trial Division to determine the merits of defendant's claim for offsets based on both alleged payments on the claim and gratuitous offsets.

In No. 6–78, the decision of the Indian Claims Commission is affirmed.