**Helen L. COOLEY, William O. Cooley, and The 7C Company, Plaintiffs–Appellees,**

v.

**UNITED STATES, Defendant–Appellant.**

**No. 01–5071.**

United States Court of Appeals, Federal Circuit.

DECIDED: April 1, 2003.

erred when it denied Taxpayers the benefit of a deduction.

Jerry Stouck, Spriggs & Hollingsworth, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were Rebecca A. Womeldorf and Vivek K. Hatti. Of counsel was Michael R. Miner.

Susan V. Cook, Attorney, Environment & Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were John Cruden, Acting Assistant Attorney General; Katherine W. Hazard and Ellen J. Durkee, Attorneys. Of counsel on the brief were Martin R. Cohen, Attorney, Office of the Chief Counsel, U.S. Army Corps of Engineers, of Washington, DC; and Steve Adamski, Attorney, Office of General Counsel, U.S. Army Corps of Engineers, of Saint Paul, Minnesota.

David E. Haddock, Pacific Legal Foundation, Sacramento, California, for amicus curiae Pacific Legal Foundation. With him on the brief was M. Reed Hopper.

Before MAYER, Chief Judge, RADER and DYK, Circuit Judges.

RADER, Circuit Judge.

The United States Court of Federal Claims determined that the Army Corps of Engineers (Corps) took the property of Helen L. Cooley, William O. Cooley, and the 7C Company (collectively, Cooley) by denying a fill permit application under § 404 of the Clean Water Act, 33 U.S.C. § 1344 (1994). *Cooley v. United States*, 46 Fed. Cl. 538 (2000). Because the Corps' denial of the permit application was a final decision rendering Cooley's taking claim ripe, and because this record does not

show whether the Government's later issuance of a provisional permit rendered the taking temporary, this court affirms-in-part, vacates-in-part, and remands.

## I.

In 1972, Cooley purchased a thirty-three acre parcel of land at the Highway 10 and Hansen Boulevard interchange in Coon Rapids, Minnesota, intending to eventually develop a mixed-use commercial project including hotels, a car wash, restaurants, and other commercial buildings. In 1989, Cooley began developing the property and securing permits for the development. In February 1990, the Corps asserted that most of the site comprised wetlands and, thus, required a permit under the Clean Water Act before any development could occur. Cooley spent the next three years prosecuting an application for a wetlands fill permit under § 404.

To acquire a fill permit under § 404, federal regulations require an applicant to rebut a presumption that commercially feasible, less environmentally damaging alternative sites are available, or that commercially feasible minimization of the development scope will prevent damage to the wetlands. 33 C.F.R. § 320.4 (2000). Thus, during prosecution of its permit application, Cooley submitted four alternative sites and explained that each of the four sites was an inadequate alternative as "either developed or undevelopable ... already developed for commercial use ... zoned for residential use ... almost entirely wetland ... [or] too far north of [the area mall] to meet the project purpose." The Corps found this information insufficient, and required Cooley to submit information for more alternative sites within an expanded geographic area. The Corps did not specify the limits of the expanded geographic area, but referred generally to the Highway 10 corridor. Cooley responded to this request for additional alternative

sites by referring to its previous submission discussing the four inadequate sites.

On February 25, 1993, the Corps denied Cooley's application for a § 404 fill permit to develop the property. The official denial letter, signed by Richard W. Craig, District Engineer of the Corps' St. Paul District Office, stated: "I must deny your request.... I would suggest that if you still desire to develop the property, you may wish to substantiate more thoroughly your contentions that feasible, less environmentally-damaging alternative sites are not available and that minimization is not practicable." Several weeks before issuing the denial letter, however, Tim Fell of the Regulatory Functions Branch for the Corps' St. Paul District Office recommended that the Corps "proceed with the decision based on the available information and not hold a meeting" to permit Cooley to submit additional information. Later, on February 18, 1993, Mr. Fell wrote in an internal memorandum: "I think Cooley has provided enough information so we can't deny based on failure to provide adequate info...." By denying the permit, the Corps prohibited any commercial development on Cooley's property, resulting in a loss of at least 98.8% of the land value.

Upon denial of its § 404 fill permit application, in July 1993, Cooley filed in the Court of Federal Claims an action for just compensation for the Government's taking of its property. In response, the Corps' counsel suggested to the Corps that "some type of permit could be issued ... [as] a way to avoid the takings issue." After litigation had commenced, on December 14, 1993, Mr. Ben Wopat, Regulatory Functions Branch Chief for the Corps' St. Paul District Office, sent Cooley a letter suggesting that the Corps might be willing to issue a permit for a narrower scope project. Cooley's counsel responded that the Corps had already denied the permit,

but that Cooley would consider settlement of the case if the Corps granted the previously denied permit. The Corps did not respond to this offer.

Nonetheless, in 1995, during the litigation, the Corps, sua sponte, performed its own alternatives analysis concerning Cooley's site. In April 1996, the Corps issued a reduced scope permit that it believed would allow Cooley reasonable use of the land. Cooley rejected this partial permit. Although Mr. Wopat doubted he could lawfully issue a permit of broader scope, both Corps headquarters and the Department of Justice urged issuance of a permit, apparently to avoid a trial. Thus, on July 26, 1996, ten days before the commencement of trial and on the same day the Government filed its brief, the Corps issued a permit that ostensibly allowed Cooley to develop the entire property. The Corps issued this permit subject to Cooley developing and submitting a mitigation plan capable of receiving Corps approval. The permit stated: "PROVISIONAL PERMIT ... NOT VALID ... DO NOT BEGIN WORK." The permit contained three additional conditions: (1) Cooley must obtain a § 401 Water Quality Certification from the Minnesota Pollution Control Agency; (2) Cooley must sign and return the provisional permit with a $100 fee; and (3) the "Corps [would need to] sign[ ] the permit and return[ ] it to [Cooley]." Before issuance of this provisional permit, the Corps' Assistant Chief Counsel, Mr. Lance Wood, had opined that the property consisted of degraded wetlands.

Cooley rejected the July 1996 provisional permit and continued litigation. Cooley doubted the validity of the provisional permit. Furthermore, many hotel and restaurant merchants had already begun to develop other projects in the same region between 1993 and 1996. Cooley was, therefore, concerned that the window of economic success for the proposed commercial development had closed. Moreover, Cooley had already invested several hundred thousand dollars in litigation costs.

In a thorough and careful opinion dated April 28, 2000, the Court of Federal Claims held that the Corps' denial of the § 404 permit was a final decision, rendering Cooley's taking claim ripe. Further, the court found that the denial was a permanent categorical taking of Cooley's property, and, thus, awarded Cooley approximately $2 million in damages. The Corps timely appealed to this court, which has exclusive appellate jurisdiction. 28 U.S.C. § 1295(a)(3) (2000).

## II.

■■■ "Whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings." *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed.Cir. 1998). Thus, this court reviews the Court of Federal Claims' conclusions of law without deference. 5 U.S.C. § 706(2)(C) (2000); *Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1372 (Fed.Cir. 2001); *Kane v. United States*, 43 F.3d 1446, 1448 (Fed.Cir.1994). This court reviews the Court of Federal Claims' findings of fact for clear error. *City of El Centro v. United States*, 922 F.2d 816, 819 (Fed.Cir.1990). The trial judge's credibility determinations, however, "can virtually never be clear error." *First Interstate Bank v. United States*, 61 F.3d 876, 882 (Fed.Cir.1995) (citations omitted).

## A.

■■■ A taking claim is ripe "once ... the permissible uses of the property are known [by the court] to a reasonable degree of certainty." *Palazzolo v. Rhode Island*, 533 U.S. 606, 620, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). To be ripe, a

taking claim based on a § 404 permit denial must spring from a final decision. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Alternatively, a claimant can show its claim was ripe with sufficient evidence of the futility of further pursuit of a permit through the administrative process. *MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 350 n. 7, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986).

▆▆▆ A final decision denying a § 404 permit on the merits provides information that "a regulation has deprived a landowner of all economically beneficial use of the property, or defeated the reasonable investment-backed expectations of the landowner to the extent that a taking has occurred." *Palazzolo,* 533 U.S. at 618, 121 S.Ct. 2448 (citations and internal quotations omitted); *see also MacDonald, Sommer & Frates,* 477 U.S. at 351, 106 S.Ct. 2561 (stating that the court must know the "nature and extent of permitted development" on the land in question to determine whether a taking claim is ripe for review). A permit denial is final when the applicant has no appeal mechanism available and the denial is based on an unchanging fact. *Bayou des Familles Dev. Corp. v. United States,* 130 F.3d 1034, 1040 (Fed.Cir.1997).

▆▆▆ The Corps asserts that Cooley's taking claim is not ripe because its 1993 permit denial was not a final decision. To the contrary, the record shows an unconditional denial issued in February 1993. At that point, the Corps' representative wrote: "I must deny the request." The denial effectively prohibited any commercial development on Cooley's site, resulting in a loss of at least 98.8% of the land value. Cooley thus essentially lost all economically beneficial use of the land, despite having secured all other necessary permits.

Just before the Corps issued that 1993 denial, Mr. Fell had determined that the Corps had received adequate information from Cooley to deny the permit on the merits. *See supra* Part I. Mr. Fell felt that a meeting to allow Cooley to provide additional information was unnecessary. The Corps' denial letter also stated that a permit "would be contrary to the public interest" and "would result in unacceptable degradation of a valuable wetland resource." A thorough, fifteen page, single-spaced "Evaluation and Decision Document" accompanied the denial letter and explained the merits of the decision. The "Evaluation and Decision Document" rejected, among other things, Cooley's contention that the wetlands were degraded. Cooley did not appeal the 1993 action because the Corps had no administrative appeal mechanism under its regulations at that time.* Because the *Corps* denied Cooley's application for a § 404 permit based on what it considered adequate information, and because no Corps regulation permitted an administrative appeal, the 1993 denial was a final decision. Thus, the taking claim was ripe.

▆▆▆ Even if, *arguendo,* the 1993 denial did not constitute a final decision, it would have been futile for Cooley to pursue further prosecution of the permit application. A landowner need not resort to futile piecemeal litigation or submit to repetitive application requirements to make a taking claim ripe. *MacDonald, Sommer & Frates,* 477 U.S. at 350 n. 7, 106 S.Ct. 2561. After a final decision, an applicant need not submit further applications. Rather, the applicant may choose to file a

---

* In 1995, the Corps rejected a proposed amendment to its regulations that would permit reconsideration of adverse permit decisions. *See* 60 Fed. Reg. 37,280, 37,283 (July 19, 1995). In 2000, the Corps approved an appeal process. *See* 65 Fed. Reg. 16,492 (Mar. 28, 2000), (codified at 33 C.F.R. 320.1(a)(2) (2000)).

taking claim before the Court of Federal Claims. *See Bayou*, 130 F.3d at 1038–39. Submitting a new application is futile when unchanging facts and applicable law preclude a permit. *Id.* at 1040.

In the present case, the Corps denied the permit in the public interest to avoid damage to valuable wetland resources. In forming its litigation strategy, members of the Corps doubted whether the Corps could issue legally valid permits after the 1993 denial. Nevertheless, the Corps ignored its previous findings and analysis and issued the 1996 permits based on Mr. Lance Wood's "opinion" that the property consisted of degraded wetlands.

Mr. Wood was the Corps' Assistant Chief Counsel for Regulation. Unlike the Corps' engineers involved in the original evaluation of whether the land was wetland in 1990, Mr. Wood never visited the site in forming his opinion. Mr. Wood's opinion was inconsistent with the Corps' 1993 denial letter, initial evaluation, and the "Evaluation and Decision Document." Mr. Wood's opinion did not change the facts explained in the Corps' thorough "Evaluation and Decision Document" that the site was almost entirely a valuable wetland resource and that development on the site would be contrary to public interest.

From February 1993 until a couple of years into litigation, the Corps did nothing to promote the issuance of Cooley's permit. As the trial date approached, however, the Corps sought to alter its analysis and issue new permits. Despite a federal regulation denying the Corps a role as either "a proponent [or] opponent of any permit proposal," 33 C.F.R. § 320.1(a)(4) (1996), the Corps contacted and convinced the Minnesota Pollution Control Agency to waive Cooley's application for a § 401 Water Quality Certification.

The Court of Federal Claims held the Corps was not authorized by its own regu-

lations from issuing a permit after a denial on the merits. *Cooley*, 46 Fed.Cl. at 547–48. As discussed above, Corps regulations at the time did not permit reconsideration of a denial. The Court of Federal Claims found that 33 C.F.R. § 325.2(a)(7) rendered the 1993 denial a final decision on the merits that could not be appealed to the Corps when "the signature of the issuing official [is placed] on the [denial letter]." *Id.* at 545.

■■■ This court, as did its predecessor, acknowledges an agency's prerogative to "reconsider its own decisions." *United States v. Sioux Tribe*, 222 Ct.Cl. 421, 616 F.2d 485, 493 (1980). In this case, however, as this opinion shall discuss more fully later, the Corps did not offer to rescind the taking and unconditionally grant a valid, actionable permit. Instead, the Corps offered a provisional permit. Because the Corps regulations offered no process to change a final decision, and because the factual inconsistencies surrounding the permit denial could not be changed with additional documentation, the Court of Federal Claims correctly held that further pursuit of a process already years old was futile.

The Corps draws this court's attention to the few lines in the 1993 denial letter that extended an invitation to Cooley to submit more information if it wished to continue to pursue a permit. That courteous, but ineffectual, invitation did not alter the finality of the denial or the ripeness of Cooley's taking claim in the Court of Federal Claims. Without any specific indication of the nature and extent of additional information necessary to acquire a permit, this passing polite remark could not alter the finality of the denial. Indeed, this general invitation to begin again a process that had yielded a final denial (complete with extensive reasoning supporting the negative decision) underscored the futility

of continuing indefinitely to prosecute the application process. *MacDonald, Sommer & Frates*, 477 U.S. at 350 n. 7, 106 S.Ct. 2561; *Bayou*, 130 F.3d at 1038–39.

Because unchangeable facts and existing regulations indicated the Corps was precluded from granting approval after the 1993 denial, it would have been futile for Cooley to continue prosecution of its application. In sum, the Court of Federal Claims correctly held that Cooley's taking claim was ripe for adjudication.

### B.

"While a taking often occurs as a result of a physical invasion or confiscation, the Supreme Court has long recognized that 'if regulation goes too far it will be recognized as a taking.'" *Conti v. United States*, 291 F.3d 1334, 1338 (Fed.Cir.2002) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). "[W]hen *no* productive or economically beneficial use of land is permitted [by the regulation]," a taking is categorical. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1017, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (emphasis in original). When a taking is non-categorical, i.e., less than a complete elimination of value or a total loss, the court must embark on a fact-based analysis as applied in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *Lucas*, 505 U.S. at 1019–20 n. 8, 112 S.Ct. 2886.

In the present case, the Court of Federal Claims determined that the 1993 permit denial destroyed at least 98.8% of Cooley's property value. *Cooley*, 46 Fed.Cl. at 547. As a result of that denial, Cooley could no longer develop its property. *Id.* Hence, the court concluded that the Corps denied Cooley essentially all economically viable use of its land, and that under *Lucas*, a permanent categorical taking occurred. *Id.*

The Corps argues that its subsequent issuance of partial and full permits in 1996 made the taking, if a taking at all, only temporary. Although the Corps had no procedure giving an applicant an avenue to seek reconsideration of a final denial, the Corps contends that it, nonetheless, possessed the authority on its own to revisit a denial. In the Corps' view, nothing in the statute or regulations forbade it from reconsidering its 1993 denial in 1996 on the cusp of litigation.

The Court of Federal Claims disagreed, noting: "The regulations have not changed, and the agency's interpretation of its regulations is not tenable as well as tied to its litigating position in only this case." *Cooley*, 46 Fed.Cl. at 548. Indeed, the Corps concedes that its regulations contained no provision to rescind its 1993 taking. The trial court stated that the Corps only revisited its 1993 denial by issuing an invalid "provisional permit" as a litigation strategy, not as an effort to immediately rescind the taking. The provisional permit was conditioned on the performance of compensatory mitigation, but the Corps never negotiated a mitigation plan with Cooley. The Corps acknowledged that "no specific mitigation site or plan is directed by the permit." Thus, the nature and extent of the requisite compensatory mitigation could not be ascertained from the provisional permit. As aforementioned, the permit carried the express label "NOT VALID ... DO NOT BEGIN WORK." The trial court found that these various conditions and legal uncertainties that accompanied the expressly provisional permit gave Cooley ample reason to refuse to rely on this provisional permit, as issued, to undertake development. This record, however, does not support the trial court's finding of a categorical taking, and therefore, this aspect of the trial court's decree is vacated for reasons articulated below.

 Contrary to the trial court's holding, the record shows that the 1993 denial apparently destroyed less than all of Cooley's property's value, which constitutes a non-categorical taking. The categorical takings directives of *Lucas* do not apply. Therefore, the trial court must embark on a fact-based *Penn Central* analysis to determine whether a compensable taking arose. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 1483, 152 L.Ed.2d 517 (2002) ("Anything less than a 'complete elimination of value,' or a 'total loss,' the Court acknowledged, would require the kind of analysis applied in *Penn Central.*") (citing *Lucas,* 505 U.S. at 1019–20 n. 8, 112 S.Ct. 2886). This court recently acknowledged that the initial denial of a governmental permit may trigger a ripe takings claim for which an aggrieved landowner may seek compensation. *See Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1347 (Fed.Cir.2002). If at some point thereafter the government reconsiders its stance and grants a permit, the aggrieved party may seek compensation for the "temporary regulatory taking" of his property. *Id.* In either the case of a permanent or a temporary regulatory taking, "*Penn Central* will govern whether the initial denial of the permit actually took the property in question." *Id.* The *Penn Central* test identifies three factors: (1) the economic impact of the regulation; (2) the extent to which the regulation has interfered with the distinct investment-backed expectations; and (3) the character of the governmental action. *Penn Cent. Transp. Co.,* 438 U.S. at 124, 98 S.Ct. 2646.

 As discussed above, the permit denial was a final decision of the agency, from which a claim for a permanent taking may spring. The trial court did not recognize that a *Penn Central* analysis is required, as Cooley's land retains some economic value. Whether the provisional permit issued by the Corps transformed Cooley's claim into a temporary taking directly affects the compensation assessment. Thus, on remand, the trial court may address whether the Government's actions in 1996 converted the 1993 taking to a temporary taking. This inquiry may lead further to an inquiry into Cooley's standing to challenge the validity of the 1996 permit.

Arguably, the provisional permit was an invitation to Cooley to entertain further negotiations with the Corps. Nevertheless, a conditional permit is still a permit, especially when the conditions attached thereto are not atypical. If the Corps actually granted Cooley a valid permit permitting development, the government has firm grounds to assert that any taking was only temporary. *See Boise Cascade Corp.,* 296 F.3d at 1347.

 In assessing whether a valid, actionable permit issued, the trial court erred in finding that the Corps was legally precluded by its own regulations from reconsidering its initial denial of Cooley's permit. Because *Sioux Tribe* is binding precedent, this court recognizes an agency's ability to "reconsider its own decisions." *Sioux Tribe,* 616 F.2d at 493. Therefore, although the 1996 provisional permit contained some deficiencies, it may still have operated to transform the permanent taking that ripened in 1993 into a temporary taking. The Corps' ability to reverse its course, however, is not unrestricted. Reconsideration of an agency's decision must arise within a reasonable period of time, as noted by a predecessor to this court. *See Bookman v. United States,* 453 F.2d 1263, 1265, 197 Ct.Cl. 108 (1972) (stating "this court will sustain the reconsideration decision of an agency, as long as the administrative action is conducted within a short and reasonable time period"). Thus, the Corps arguably could only issue a valid permit if the delay be-

tween the initial permit denial in 1993 and the provisional permit in 1996 was reasonable under the circumstances of this case. The trial court, upon remand, should develop the record in this aspect when determining whether the Corps' reconsideration of Cooley's permit application was properly undertaken and legally sufficient to make the permanent taking temporary.

 Even if the offer of a provisional permit converted the 1993 permit denial into a temporary taking, Cooley may still receive compensation. However, the Supreme Court recently rejected application of the per se taking rule articulated in *Lucas* to temporary development moratoria. *Tahoe–Sierra Pres. Council,* 122 S.Ct. at 1489. In *Tahoe,* the Court held that no categorical per se taking rule applies to temporary moratoria on land development, even though such moratoria may deprive a landowner of all economically viable uses of a parcel for a period of time. *Id.* Except in the situation in *Lucas* where the Government permanently deprived the plaintiff of *all* economic value in the property, the judicial inquiry to ascertain the occurrence of a taking proceeds under the legal regime of *Penn Central. Id.* Thus, if a claimant survives a *Penn Central* analysis, temporary moratoria can qualify as compensable takings. Under the Supreme Court's decision in *Tahoe,* reasonable delays incident to the permitting process are not compensable. "Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership. They cannot be considered as a taking in the constitutional sense." *Tahoe,* slip op. at 32 (internal quotations and citations omitted). Only an "extraordinary" delay leads to compensation. *Boise Cascade,* 296 F.3d at 1349–50; *Wyatt v. United States,* 271 F.3d 1090, 1098 (Fed.Cir. 2001).

With respect to the first *Penn Central* factor—economic impact of the regulation—the Corps' denial of a § 404 fill permit in 1993 effectively prohibited any commercial development on Cooley's land. As a result, the trial court found that the value of that land decreased by at least 98.8% after the 1993 permit application was denied. This finding was based on the assumption that the 1996 permit was invalid and ineffective to convert the taking into a temporary taking, an assumption that may be further explored on remand. Any finding of decreased land value on remand must be weighed in a *Penn Central* analysis.

As to the second *Penn Central* factor—the extent to which the regulation has interfered with distinct investment-backed expectations—the record shows that Cooley purchased the land in 1972 intending to eventually develop a mixed-use commercial project including hotels, a car wash, restaurants, and other commercial buildings. During the four-year period encompassing the permit application and ensuing litigation, an explosion of commercial activity occurred in the target area. The trial court extensively discussed in its opinion the impact of the permit denial on the value of Cooley's land during this period. On remand, the trial court will have the opportunity to assess the effect of the Corps' permit denial on Cooley's window of commercial opportunity in the proper context of a *Penn Central* analysis.

Finally, with respect to the third *Penn Central* factor—the character of the governmental action—the trial court will have the opportunity on remand to consider both the nature of the permitting process and the reasons for delaying the Cooley permit. *See Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 799 (Fed.Cir.1993). This court recognizes that an extraordinary delay in decision-making may consti-

tute a taking. *See Wyatt*, 271 F.3d at 1098 (citing *Tabb Lakes*, 10 F.3d at 803). Cases in which this court will find a taking based on extraordinary delay without a concomitant showing of bad faith are rare creatures. *Id.* at 1098. Moreover, the length of the delay is not the only or necessarily the critical factor for finding a taking by extraordinary governmental delay. *Id.*

Here, the record indicates Cooley, after two years of disputing the characterization of its property as protected wetlands, applied for a wetlands fill permit under the Clean Water Act. The Corps requested additional information on alternative sites suitable for the proposed mixed development, information supplied by Cooley in 1992. Based upon the information provided by Cooley, the Corps denied the requested permit in 1993. The Corps continued to delay action even after consulting an outside expert in 1995, whose report confirmed Cooley's 1992 contention that suitable alternative sites were unavailable. The Corps ultimately agreed with Cooley in 1996 that the parcel in question is indeed a degraded wetland. The trial court should consider this sequence of events in determining whether the Corps' actions meet the criteria for a finding of extraordinary delay.

In the context of making this finding, the trial court may weigh this court's guidance that governmental agencies are best suited to develop the technical information necessary to adequately process a permit application. Accordingly, those agencies receive appropriate deference in acquiring technical information. *See Wyatt*, 271 F.3d at 1098. However, in the instant case the agency admits its requests for additional information were not necessary for issuing a permit. The trial court previously discounted the credibility of the Corps' argument that the permit denial letter requested additional information in an altruistic effort to issue a permit. In con-

ducting a *Penn Central* analysis, the trial court may weigh whether the Corps' conduct evinces elements of bad faith. A combination of extraordinary delay and intimated bad faith, under the third prong of the *Penn Central* analysis, influence the character of the governmental action.

On remand, the trial court will also have the opportunity to reconsider its determination that a categorical taking transpired in view of the Supreme Court's reiteration that the rule in *Lucas* applies when an owner has been deprived of all economically beneficial use his land. If Cooley indeed was deprived of less than all of the economically beneficial use of its land, the trial court must determine whether a temporary or permanent noncategorical taking occurred, keeping in mind the precedent set forth in *Sioux Tribe, Boise Cascade,* and *Bookman.* In sum, in the event Cooley did not lose all economically beneficial use of the land, the *Penn Central* factors must support any conclusion that the Corps' denial of a § 404 wetlands fill permit in 1993 constituted a compensable taking.

### III.

The Court of Federal Claims correctly held that Cooley's taking claim was ripe for adjudication. However, the record for consideration in this appeal is not clear as to whether the Government's denial in 1993 of Cooley a § 404 fill permit constitutes a compensable taking. Therefore, this case is remanded for further consideration commensurate with this opinion.

### COSTS

Each party shall bear its own costs.

AFFIRMED IN PART, VACATED IN PART, and REMANDED.

DYK, Circuit Judge, concurring.

I join the majority opinion, and simply note, as the majority recognizes, *ante* at 1305, that the question of the Cooleys' standing to challenge the validity of the 1996 permit remains to be determined.