GREEN, Judge,
delivered the opinion of the court:
This suit is brought under the provisions of an act of Congress approved June 3, 1920, authorizing the Sioux Tribe of Indians to submit to the Court of Claims all claims against the United States arising under any treaties, agreements, or laws of Congress, or for misappropriation of any of the funds or lands of said tribe or band thereof, or for the failure of the United States to pay said tribe any money or other property due. The original petition filed on May 7, 1923, presented several distinct causes of action. On February 16, 1934, a motion was filed in this court by the plaintiff asking leave to file separate amended petitions in the case, and, this motion having been granted by the court, the plaintiff filed a separate amended petition en *195 titled “C-531 (8) Annuities'1'1 on May 7,1934. This amended petition presents the claim of the Sioux Tribe of Indians for damages sustained by the alleged failure of the United States to fulfill its obligations with reference to annuities promised to be paid to the Sioux Indians in the form of property or money by the treaty of April 29, 1868.
At the time this treaty was negotiated, the Sioux consisting of several tribes taken together was one of the largest in population among the “Plains Indians.” At that time they had been allotted reservations in what are now the States of North Dakota, South Dakota, Nebraska, and Montana. The individual members of this tribe were practically uncivilized. They lived by hunting and the chase together with such means of subsistence as was furnished by the Government under arrangements previously made. They were warlike in their nature, many of them hostile to the whites and also to other Indians, and endangered the settlers on the frontiers and travel to the Pacific Coast.
The treaty of 1868 was made with the purpose on the part of the United States to remove the causes of war with the Indians, to secure the white settlements from their depredations, and make travel to the Pacific safer. In order to do this it was realized that some inducement must be offered the Indians to adopt civilized pursuits and live upon the reservations, which were provided for them.
Article X of the treaty of 1868 among other things provides:
And in addition to the clothing herein named, the sum of ten dollars for each person entitled to the beneficial effects of this treaty shall be annually appropriated for a period of thirty years, while such persons roam and hunt, and twenty dollars for each person who engages in farming, to be used by the Secretary of the Interior in the purchase of such articles as from time to time the condition and necessities of the Indians may indicate to be proper.
It is upon this provision in the treaty that the plaintiff relies to support its case now being considered. As we understand the contention of the plaintiff, it is in substance *196 and effect that the word “farming”, as used in the treaty, means any civilized pursuit and that as so construed the-provisions of the treaty with reference to farming included all the Indians settled upon the reservation. The remainder of the tribe, under plaintiff’s construction of the treaty, must have been persons who “roam and hunt.”' Plaintiff undertakes to show by the evidence the number of Indians settled on the reservation who are under this-theory entitled annually to twenty dollars each and subtracting this result from the whole number of the tribe (in each case including men, women, and children) arrives, at what is claimed to be the number of those engaged in roaming and hunting. On the part of the defendant, it is strenuously insisted that such a construction or application of the treaty is wholly erroneous. These opposing contentions make the proper construction of the treaty the principal issue in the case.
It is apparent that the provision in controversy (Article-X) is crudely drawn and so indefinite that the court must determine as best it can from the language used together with the surrounding circumstances what in fact was intended, meant,-and understood by it and in this connection it will be well to consider other provisions of the treaty.
The agreements with reference to the appropriation of money comprised only part of the benefits promised by the treaty. When the other covenants are examined, it will be seen that there is an important distinction between them and the agreement now being considered in that they specified distinctly the Indians, who were entitled to benefits under them in such a manner that they could be identified and numbered. For example, an Indian who was the head of a family who desired to commence farming would have the privilege of selecting a certain acreage of land and a person over eighteen years of age not the head of a family might select a smaller amount, and in both cases be entitled to possession as long as the land-was cultivated. In the same manner the head of a family or lodge was entitled to receive a certain amount of seeds and .implements.
*197 In the same article of the treaty in which is found the provision upon which plaintiff’s case is based there was also a stipulation that the males over fourteen years of age. the females over twelve years of age, and the boys and girls under these ages in each class were to receive a specified amount of clothing annually and that “each Indian over the age of four years, who shall have removed to and settled permanently upon said reservation and complied with the stipulations of this treaty”, shall be entitled to a certain amount of meat and flour a day. The provisions last referred to are the only ones which mention women and children, and they are made definite in this respect. We think this indicates that if it had been intended that the provision in controversy should apply to women and children it would have been so specified. But regardless of whether this conclusion can be properly drawn, it must be conceded that the agreement under consideration is not general in its nature. We think that it applies only to the particular classes which it specifies and that there is nothing in the language used to indicate that these agreements were intended to apply to the tribe as a whole. On the contrary, in our opinion, particular classes were selected and distinguished by occupation from the remainder of the tribe. One class consisted of persons roaming and hunting; the other, of those who were engaged in farming. Those roaming and hunting may be said to include the adult males of the tribe, but we think it obvious that the expression could not include women and children, and even if it should be conceded for the sake of the argument that the word “farming”, as used in the treaty, was understood by the Indians to have a wider meaning than was given it by the whites, it is still quite evident that the words “each person who engages in farming” did not include children.
Finding 14 shows that in order to comply with the provisions of Article X of the Treaty of 1868 with reference to roamers and hunters and farmers, Congress made appropriations in the total sum of $5,488,469.95. Of the amount so appropriated, the sum of $414,088.02 was unused and *198 returned to surplus in the Treasury of tbe United States. It is claimed that part of the disbursements were not made for the benefit of the Indians, but as there is an entire lack of proof as to the amount to which the Indians were entitled this is immaterial, and evidently the Government officials who disbursed the money considered that more had been appropriated than was necessary.
The plaintiff submits a computation which it is claimed shows the aggregate annual numbers of Indians engaged in agriculture and other civilized occupations during the period of the treaty to be 481,545, and multiplying this number by twenty finds that there should have been appropriated $9,630,900 on account of those engaged in agriculture. The aggregate of annual numbers of Indians roaming and hunting is calculated to be 348,753 and multiplying this sum by ten it is found that there is $3,487,530 for which appropriation should have been made on account of those roaming and hunting, and on this basis the total obligation of defendant for annuities is put at $13,118,430. This computation, however, is based on what is claimed to be the total number of the Sioux population. The parties disagree as to what this number is, and we have found that it can not be determined with any degree of certainty. Possibly, if this were the only defect in plaintiff’s casé, this lack of certainty as to the total number of Indians might not prevent the rendition of a judgment in favor of the plaintiff for some amount. But under our construction of the treaty, the total number of the Indians is not material in determining the amount of the annuities. The amount which should have been appropriated depends upon the number of hunters and farmers for whose benefit the appropriations were required to be made, and on this point there is no evidence. Under our construction of the language used in the treaty, it is clear that plaintiff can not recover.
Plaintiff’s petition must be dismissed, and it is so ordered.
Whaley, Judge; Williams, Judge; LittlbtoN, Judge; and Booth, Chief Justice, concur.