The SIOUX TRIBE OF INDIANS

v.

The UNITED STATES

No. 74.

United States Claims Court.

Feb. 7, 1985.

Arthur Lazarus, Jr., Washington, D.C. for plaintiff. Marvin J. Sonosky and William Howard Payne, Washington, D.C., of counsel.

Edward J. Passarelli, Washington, D.C., with whom was Asst. Atty. Gen., F. Henry Habicht, II, Washington, D.C., for defendant.

## SUMMARY JUDGMENT OPINION—II GRATUITOUS OFFSETS

YOCK, Judge.

This case involves the appropriate valuation to be placed upon Sioux tribal lands acquired by the United States under the Treaty of April 29, 1868 (1868 Treaty), 15 Stat. 635. The parties have in effect filed cross-motions for summary judgment to determine whether the Federal Government will be allowed, at a later trial, to prove gratuitous offsets to be applied against a $43,949,700 interlocutory judgment awarded to the plaintiff for lands ceded to the United States pursuant to the 1868 Treaty. This motion is one of six summary judgment motions brought by the parties in the offset portion of this case.

The issues in this very old case are complex and difficult. In order to narrow the issues and to make the case manageable, this Court required the parties to separately brief six different summary judgment issues. *See Sioux Tribe of Indians v. United States,* No. 74 (Ct.Cl. May 14, 1982) (Trial Judge's Post-Trial Order). Accordingly, the parties have individually addressed each of the following issues: payment on the claim offsets, gratuitous offsets, land adjustment claims, res judicata/collateral estoppel, the use of vouchers to prove offset claims, and other miscellaneous issues.

On August 29, 1984, this Court issued its opinion in *Sioux Tribe of Indians v. United States,* 6 Cl.Ct. 91 (1984) (Summary Judgment-I Opinion), denying the plaintiff's summary judgment motion which sought to disallow the defendant's pay-

ments on the claim offsets as a matter of law. The instant summary judgment motion and this Opinion address only those issues concerning gratuitous offsets.[1] Summary Judgment Opinions III–VI, addressing the remaining issues, will be forthcoming.

The Court must decide here whether the nature of the claim and the entire course of dealings and accounts [2] between the Federal Government and the Sioux Tribe, in good conscience, warrants the offsetting of gratuities. The plaintiff argues that the nature of the claim and the entire course of dealings between the Federal Government and the Sioux Tribe have been so flagrantly egregious and unfair that good conscience does not warrant the offsetting of gratuities. Thus the plaintiff moves to summarily deny all of the defendant's gratuitous offset claims. The Federal Government, on the other hand, asserts that its entire course of dealings and accounts with the Sioux Tribe have been basically fair and honorable, warranting, in good conscience, the allowance of gratuitous offsets by this Court. It thus argues that it should be entitled to the opportunity to establish, at a forthcoming trial, those gratuities, given to the Sioux Tribe over the course of some 117 years, that should be allowed as offsets against the $43,949,700 interlocutory land valuation award.[3] In deciding this motion for summary judgment, the Court held a four day hearing on May 10–13, 1982, which focused primarily on the issue to be decided here. Subsequently, both parties presented their respective post hearing findings of fact and briefs.

For the reasons cited herein, the plaintiff's motion for summary judgment is granted. After an exhaustive review of the nature of the claim and of the entire course of dealings and accounts between the Sioux Tribe and the Federal Government over the course of some 117 years, this Court finds that the Federal Government's dealings with the Sioux Tribe have been egregious and unfair. Therefore, principles of equity and good conscience will not permit the allowance of gratuitous offsets. The Government will thus be precluded from presenting any evidence of such "over the course" gratuities in any forthcoming trial.[4]

1. Gratuitous offsets and payments on the claim offsets are two different types of statutory offsets authorized by the Indian Claims Commission Act, 25 U.S.C. § 70a (1976).

   Payments on the claim offsets are considered mandatory offsets, stemming from treaty obligations undertaken by the United States in exchange for the benefit received. Indian Claims Commission Act, 25 U.S.C. § 70a (1976). *See United States v. Assiniboine Tribes of Indians,* 192 Ct.Cl. 679, 693, 428 F.2d 1324, 1331 (1970).

   Gratuitous offsets involve Government expenditures undertaken solely for the benefit of the tribe. Unlike payments on the claim offsets, gratuitous offsets are not obligations flowing from the treaty but are expenditures furnished gratuitously. While payments on the claim offsets must be allowed if proven, courts have the discretion to allow or to deny gratuitous offsets. *Id. See also Kickapoo Tribe of Kansas v. United States,* 178 Ct.Cl. 527, 372 F.2d 980 (1967).

2. Under the Indian Claims Commission Act, this Court possesses the discretion to offset gratuities "if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action." 25 U.S.C. § 70a (1976).

3. The Government, in this case, is claiming approximately $6 million in gratuities and approximately $10 million in "contingent gratuities." The $10 million of "contingent gratuities" are contingent on this Court's denying them as payment on the claim offsets. *Sioux Tribe of Indians v. United States,* No. 74 (Ct.Cl. March 22, 1982) (Defendant's Precise Statement of Claim of Offsets Due, at 48). Further, the Government is claiming some $56 million in payments on the claim offsets in this case. This Court's previous summary judgment opinion, *Sioux Tribe of Indians v. United States,* 6 Cl.Ct. 91 (1984) (Summary Judgment Opinion-I), granted the Federal Government the right to present its $56 million payments on the claim offsets in a forthcoming trial.

4. This decision will not preclude the defendant from presenting, or this Court from allowing, those possible land exchange gratuities that may have been inadvertently granted by the Federal Government from other Indian-owned land to the Sioux and which established the boundaries of the Great Sioux Reservation in Article II of the 1868 Treaty. This matter will be discussed more fully in this Court's upcoming Summary Judgment Opinion-III.

## I.

### Judicial Background

The issues giving rise to this action, or portions thereof, have been in litigation for the past sixty years. *See Sioux Nation of Indians v. United States,* 220 Ct.Cl. 442, 446–47, 601 F.2d 1157, 1159 (1979), *aff'd,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980); *Sioux Tribe of Indians v. United States,* 85 Ct.Cl. 181, *cert. denied,* 302 U.S. 717, 58 S.Ct. 37, 82 L.Ed. 554 (1937); *Sioux Tribe of Indians v. United States,* 84 Ct.Cl. 16 (1936). The parties have directly litigated this particular claim for approximately thirty-five years.

Throughout the long history of this complex case, the plaintiff, the Sioux Tribe of Indians, has claimed compensation for tribal lands acquired by the United States pursuant to the Treaty of April 29, 1868, 15 Stat. 635. The 1868 Treaty, signed at Fort Laramie, established the Great Sioux Reservation in South Dakota encompassing basically the western half of that state. The Treaty also effected the cession of vast tribal lands to the Federal Government in North Dakota, South Dakota, Montana, Wyoming and Nebraska. In return for the ceded lands, the Federal Government promised to provide the tribes with money, goods, services, and land.

The Indian Claims Commission (Commission), upon hearing the plaintiff's arguments, ruled that the 1868 Treaty was primarily a peace treaty in which the plaintiff was unaware that the defendant would acquire tribal lands. The Commission upheld the plaintiff's assertions that the defendant undertook its obligations in exchange for peace. Accordingly, the Commission precluded the Federal Government from offsetting any treaty related expenditures as payments on the claim for land. *Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 214, 256 (1978); *Sioux Tribe v. United States,* 42 Ind.Cl.Comm. 257 (1978).

The Commission further found that the Federal Government's taking of the Black Hills area of South Dakota from the plaintiff so tainted its course of dealings with the Sioux Tribes, that it could not, in good conscience, allow the defendant to offset gratuities. *Sioux Tribe v. United States, supra,* 42 Ind.Cl.Comm. at 232, *Sioux Tribe v. United States, supra,* 42 Ind.Cl. Comm. at 257. Then, after disallowing both payments on the claim offsets and gratuitous offsets, the Commission awarded the Sioux Tribes a $43,949,700 interlocutory land valuation award. *Sioux Tribe v. United States, supra,* 42 Ind.Cl.Comm. at 257.

The Federal Government immediately appealed to the U.S. Court of Claims the two offset issues decided, but it did not appeal the interlocutory land valuation award of $43,949,700. After considering the parties' respective arguments, the Court of Claims reversed the Commission on both of its offset decisions.

On the issue of payments on the claim offsets, the Court of Claims found the 1868 Treaty to be primarily a treaty of cession, rather than one of peace. Thus, the Court held that treaty related payments, goods, services, and land claimed as offsets by the defendant were "at least in substantial part, compensation for the land the Indians ceded to the Government." *United States v. Sioux Tribe,* 222 Ct.Cl. 421, 425, 616 F.2d 485, 487 (1980). Thus, the Court of Claims ruled that the Commission erred in not allowing the Federal Government the right to present its payment on the claim offsets in a later trial proceeding for merit consideration.

On the gratuitous offset issue, the Court of Claims ruled that the Commission erred in holding that the dishonorable actions of the Federal Government in 1875–77, involving the taking of the Black Hills from the Sioux did not in good conscience warrant the offsetting of any gratuities. The Court said that, although the Commission had considerable discretion to determine in the first instance whether any or all gratuities would be allowed, the discretionary decision must be based on a review of the "entire course of dealings" between the Federal Government and the Sioux. Since the Commission focused only on the

"grossly dishonorable" actions of the Federal Government between 1875 and 1877 in connection with the Black Hills land acquisition from the Sioux, the Court of Claims found the Commission to have erred and abused its discretion. *United States v. Sioux Tribe, supra,* 222 Ct.Cl. at 432–33, 616 F.2d at 491–92. *See, Sioux Nation of Indians v. United States,* 220 Ct.Cl. 442, 601 F.2d 1157 (1979), *aff'd,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980).

In reversing the Commission on these two issues, the Court of Claims remanded both the issues of gratuitous offsets and of payment on the claim offsets to its trial division, now the United States Claims Court, to determine in the first instance what the amount of offsets, if any, against the award should be. *United States v. Sioux Tribe, supra,* 222 Ct.Cl. at 433, 616 F.2d at 492. However, in remanding, the Court of Claims let stand the interlocutory land valuation award of $43,949,700 in favor of the Sioux Tribe.

Thus, in regard to the gratuitous offsets, the directive given this Court, by the Court of Claims, is to review the "entire course of dealings" between the Federal Government and the Sioux Tribe of Indians and to determine from that review whether or not gratuitous offsets should be allowed in good conscience as an offset against the plaintiff's $43,949,700 land valuation award. Such a review and findings of fact follow herein.

## II.

### Factual Findings

At the hearing held on May 10–13, 1982, the plaintiff's principal expert witness was Dr. Helen Hornbeck Tanner, an historical cartographer and a nationally known ethnohistorian. Dr. Tanner has previously testified before the Indian Claims Commission on numerous occasions with respect to the history and territory of Indian tribal claimants, including, in particular, prior appearances as an expert in this case and in litigation concerning the Sisseton and Wahpeton Sioux, two of the four bands which composed the Mississippi (or eastern) division of the Sioux Nation. *See Sioux Nation v. United States,* 40 Ind.Cl.Comm. 454, 515–16, *modified,* 41 Ind.Cl.Comm. 160 (1977); *Lower Sioux Indian Community in Minnesota v. United States,* 36 Ind.Cl. Comm. 472 (1975). Since Dr. Tanner is well qualified and well informed in these Indian matters, the Court accepted her as a qualified expert witness.

For purposes of this case, Dr. Tanner undertook a comprehensive review of the available literature concerning the Sioux tribes and, in particular, their relations with the Federal Government from the date of the first formal contact to the present. Dr. Tanner also sought out unpublished materials from such sources as the National Archives, the Missouri River Basin Investigation Studies, and the Bureau of Indian Affairs. She also conducted field trips to each of the Teton Sioux reservations in South Dakota. Based upon this research, she prepared a 136-page report entitled "A Review of Government Dealings with the Sioux," (the Tanner Report) which was supported and substantiated by 443 exhibits. Her report was received into evidence by this Court at the hearing. Plaintiff's Exhibit O–444.

In this exhaustive study on relations between the Sioux and the Federal Government during the period 1851–1981, as supplemented by her testimony before the Court, Dr. Tanner determined, *inter alia,* that: (1) the Federal Government pursued an unyielding policy to deprive the Sioux of their homeland, regardless of the actual needs of the Indians, leaving the Sioux today with only the smaller and least desired portion of their former territory; (2) the Federal Government effectively and frequently destroyed the Sioux economy by reducing the Sioux landholdings in stages, most recently during the 1960's; (3) as a result of its alleged incompatibility with the bulk of society, the Federal Government deliberately set out to eliminate, and largely succeeded in, crushing the native Sioux culture; (4) while a self-sufficient and healthy people at the time of the first white contact, the Sioux Indians have become to-

day a dependent, diseased and demoralized people—largely as the result of Federal Governmental policies which were sometimes "punitive," sometimes "larcenous," and generally "misguided"; and (5) relations between the Federal Government and the Sioux Nation have been marked repeatedly by broken Governmental promises or instances of justice delayed. Finally, Dr. Tanner concluded her report, on page 136, by stating:

> During the span of a hundred and thirty years (1851–1981), the United States government has followed multiple courses in dealings with the western Sioux. Faced by a people with different beliefs and lifestyle, the government has tried to defeat, destroy, confine, starve, ration, subjugate, evangelize, educate, collect, disperse, remove, relocate, resettle, and finally devise some form of artificial economy for reservations reduced and ruined by previous projects. The Sioux Tribes occupying the reservations have been human casualties of this "course of dealings."

In addition, the plaintiff offered the expert testimony of Mr. Robert L. Bennett, who previously served as the Commissioner of Indian Affairs for the Federal Government. Mr. Bennett has also served as the Assistant Area Director for the Bureau of Indian Affairs Aberdeen Area Office, which has jurisdiction over seven of the eight reservations upon which the plaintiff tribes reside. Subsequent to his employment by the Federal Government, Mr. Bennett served for five years as the Director of the American Indian Law Center at the University of New Mexico Law School. He is currently a consultant to numerous Indian tribes and organizations. He is well qualified to testify as an expert witness on the course of dealings issue, and his testimony was so accepted by the Court.

Mr. Bennett expressed his opinion that the Sioux tribal members "were not treated fairly." As the basis for such opinion, Mr. Bennett cited the unilateral application to the Sioux reservations, in the early 1900's, of the 1887 General Allotment Act, which

he believed had a "devastating" impact upon the Sioux people. Specifically, he pointed out that an individual allotment of land was contrary to the Sioux culture, that the allotments were not economic units capable of supporting their occupants, and that the allotments greatly facilitated the transfer of Sioux land to non-Indian use or ownership. As additional support for his opinion, Mr. Bennett cited several other instances of Federal Government actions: (1) the intentional locating of several Missouri River dams and reservoirs upon the Sioux reservation bottom lands; (2) the adverse impact upon the Sioux children of federal education policies, including, in particular, the maintenance of year-round boarding schools far from their homes; and (3) the depressed health, housing and social conditions which the Federal Government has permitted, if not caused, to exist on the Sioux reservations.

The Federal Government's expert witness in this case was Mr. Alan R. Woolworth, a trained archaeologist and currently a Research Fellow at the Minnesota Historical Society. He also has previously testified before the Indian Claims Commission. In view of his background and expertise, he was accepted as an expert witness by the Court over the plaintiff's objections.

For purposes of this case, Mr. Woolworth, in association with his wife, Nancy L. Woolworth, prepared a 165–page report (the Woolworth report) entitled "The Treaty of Fort Laramie April 29, 1868 Between the United States and the Sioux Indian Tribes: An Historical Examination of its Aftermath." Defendant's Exhibit O–108. The Woolworth report was accompanied by 107 exhibits and was supplemented at trial by an additional 23 exhibits. With the exception of one Indian Rights Association study made in 1906, of several excerpts from scattered reports of the Commissioner of Indian Affairs for the period 1900–1920, and of other excerpts from reports of the Board of Indian Commissioners during the years 1920–1932, neither the Woolworth report nor the evidentiary materials upon which it was based cover dealings

between the Sioux Nation and the Federal Government after the year 1900.

On redirect examination by the defendant's counsel, Mr. Woolworth asserted that, "generally speaking, I am of the opinion that the Federal Government's treatment and relations with the Sioux Indians * * * was on the whole commendable and fair." Previously, Mr. Woolworth had identified a series of acts by the Federal Government which involved the Sioux and which he thought to be unfair. His contrary overall conclusion was based primarily upon the premise that the Federal Government's treatment of the Sioux stemmed from "historic necessity" and that "there simply does not appear to have been any viable alternatives to the lengthy and sometimes traumatic reservation epoch of the Plains Sioux Indians." Woolworth Report, at 165.

The Treaty of September 17, 1851 (1851 Treaty), 11 Stat. 749, 2 Kapp. 594, marks the beginning of formal relations between the United States and the Sioux Nation. As originally negotiated and executed, the 1851 Treaty defined the boundaries of Indian tribal lands and provided that the Federal Government would pay the signatory tribes an annual annuity of $50,000 for 50 years. Subsequently, the U.S. Senate reduced the term of the annuity to only 10 years, subject to the acceptance of the tribes. General Sanborn, Chairman of the 1867 Peace Commission, later reported that, while the amendment was ratified by some Sioux, it "was rejected with scorn by Red Cloud, Single Horn, and by the warriors and influential men generally." Nonetheless, the annuity was cut off at the end of 10 years.

In 1855, General Harney, an officer in the United States Army, engaged in spurious negotiations with a leading Sioux chief until his cavalry was in place and then ordered an attack wiping out a Brule Indian village, inside of Sioux country, as defined by the 1851 Treaty. As a result, General Harney massacred 136 men, women and children. First represented as a victory by the United States military, historians now characterize the episode as a shameful affair, unworthy of the American military, and a disgrace to the officer who planned and executed it. The Indians knew they were trapped and would have surrendered had an opportunity been afforded to them. Such opportunity was never given.

Following the Minnesota Sioux Uprising in 1862, many of the eastern Sioux tribes fled west of the Missouri River, into the plaintiff's (western or plains Sioux tribes) territory. United States Army units soon invaded Sioux country for a campaign against the "hostiles," but, while there, actually attacked only innocent Teton and Yanktonai (the plaintiff's predecessors), who had no connection with the 1862 uprising.

Moreover, in 1865, after the discovery of gold in Montana, the United States entered into nine treaties of peace with various Sioux bands in order to provide safe passage to the gold fields for non-Indian miners and settlers through the Powder River Valley, the Sioux's best hunting grounds. However, the Upper Brule, Oglala and Hunkpapa Sioux, which resided principally along the route to Montana, refused to participate in the 1865 treaty councils and thus were not bound by the treaties. *Sioux Tribe v. United States, supra,* 42 Ind.Cl. Comm. at 234. Nevertheless, the military took possession of the Powder River country, within the acknowledged Sioux territory, and established three military posts without the consent of the resident Sioux all in direct violation of treaty stipulations.

In 1868, the parties concluded the 1868 Treaty, at Fort Laramie, which is the treaty at issue in this case. After the treaty's execution, the Federal Government asserted dominion and control over all Sioux country outside of the Great Sioux Reservation and the Article XVI "unceded Indian country."

The Federal Government made four major promises in the 1868 Treaty: (1) that the Great Sioux Reservation was "set apart for the absolute and undisturbed use and occupation" of the Sioux (Article II); (2) that no persons, except those authorized in

the treaty, "shall ever be permitted to pass over, settle upon, or reside in" the Great Sioux Reservation (Article II); (3) that "[n]o treaty for the cession of any portion or part of the reservation * * * shall be of any validity or force * * * unless executed and signed by at least three-fourths of all the adult male Indians, * * * *" (Article XII); and (4) that designated territory outside the reservation "shall be held and considered to be unceded Indian territory" and that "no white person or persons shall be permitted to settle upon or occupy any portion of the same; or without the consent of the Indians first had and obtained, to pass through the same" (Article XVI).

The Federal Government, however, violated all four of its principle treaty obligations when it permitted and, in secretly withdrawing its troops, implicitly encouraged, miners and other unauthorized persons to enter upon, to exploit, and to settle upon the Great Sioux Reservation, without the Sioux's consent. Such action led to the eventual taking of the Black Hills portion of the Great Sioux Reservation. *Sioux Nation of Indians v. United States*, 33 Ind.Cl. Comm. 151, 159–63, 247–59 (1974) (Findings 4–6). *See also United States v. Sioux Nation of Indians*, 448 U.S. 371, 375–82, 100 S.Ct. 2716, 2720–724, 65 L.Ed.2d 844 (1980); *Sioux Nation of Indians v. United States, supra*, 220 Ct.Cl. at 447–50, 601 F.2d at 1160–61.

In related litigation, *United States v. Sioux Nation of Indians*, 207 Ct.Cl. 234, 237–38, 518 F.2d 1298, 1299–1300 (1975), the Court of Claims found that:

> In 1874 an exploration led by Lieutenant Colonel Custer discovered gold in this area [the Black Hills portion of the Great Sioux Reservation]. A large number of prospectors and miners thereafter entered it without consent of the Indians or other warrant of law, and pressure began to build to open the Black Hills to white settlement. At first the Army was stationed to keep the intruders out, but * * * President Grant on November 3, 1875, secretly ordered the Army to make no further resistance to the miners going

in. At the same time, he decided not to rescind orders theretofore issued forbidding them to occupy the Black Hills country, but in the absence of enforcement, this was ineffectual. The dependence of the Sioux on Government rations was relied on to prevent their making trouble.

> The Government now decided to acquire the Black Hills from the Sioux, sending a Commission to negotiate, but it failed to reach agreement. In December 1875, the Government ordered all Sioux back to their reservation by January 31, 1876, or be treated as hostile. Those outside were hunting and could not return in time; nevertheless the Army was sent to commence military operations against them. The famous defeat of Custer occurred on June 25, 1876. Incensed by this, Congress attached a rider to the Appropriation Act of August 15, 1876, cutting off the Sioux rations until they ceded the Black Hills. Since they could not hunt, until they yielded they would starve.

> The Commission was unable nevertheless to get more than 10% of adult male Sioux to agree to cession. This was fatal to a legal acquisition by agreement, since Article XII of the 1868 Treaty provided that no cession of any part of the reservation should be valid unless three-fourths consented.

> Congress by Act of February 28, 1877, 19 Stat. 254, resolved the impasse by enacting into law the unratified agreement of September 26, 1876. This yielded up the disputed territory.

*United States v. Sioux Nation of Indians*, 207 Ct.Cl. at 237–38, 518 F.2d at 1299–1300. Further, the Court of Claims stated:

> The duplicity of President Grant's course and the duress practiced on the starving Sioux, speak for themselves. A more ripe and rank case of dishonorable dealings will never, in all probability, be found in our history * * *.

*United States v. Sioux Nation of Indians*, 207 Ct.Cl. at 241, 518 F.2d at 1302. A far more detailed account of the events leading

up to the taking of the Black Hills appears in *Sioux Nation of Indians v. United States, supra,* 220 Ct.Cl. at 454–60, 601 F.2d at 1164–67.

Beginning in 1876, the United States Army impounded and never returned over 7,000 Sioux horses and ponies, a majority of which belonged to Sioux who were not engaged in hostilities against the Federal Government. According to Dr. Tanner in her report at p. 29:

> The loss of horses was much more than economic deprivation to the Sioux; it disrupted the entire society. Horses were symbols of prestige and status among the nineteenth century Sioux. They were needed for gift-giving ceremonies, as a medium of exchange, as offerings for a man seeking entrance into a high-ranking social organization. In arranging a marriage alliance, a' young man needed horses as gifts for a girl's family to indicate that he was a reputable person. Horses had also become spiritual symbols, representing virtually supernatural power. The overall importance of horses to the Sioux cannot be overestimated, and that importance was well beyond the indispensability of horses in hunting.

Although Red Cloud demanded recompense for the seizure of the Sioux horses in 1877, the incident was characterized as "vandalism" in an 1884 investigation by the Commissioner of Indian Affairs. The claim still had not been settled when the Federal Government pressured the Sioux into giving up additional land in 1889. Shortly thereafter, Congress authorized a special investigation of the pony claim, in 1891, after the Wounded Knee Massacre. As a result of such investigation, the U.S. Army purchased cattle for the Sioux, but these animals were no substitute for the horses. An Act of Congress in 1928, recognizing additional losses of horses and ponies, preceded ultimate settlement of the Sioux pony claims on November 4, 1944.

By the Act of March 2, 1889 (1889 Act), 25 Stat. 888, Congress restored to the public domain about 9,262,000 acres from the Great Sioux Reservation, approximately one-half of the Great Sioux Reservation as diminished by the loss of the Black Hills country. *See Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 589, 97 S.Ct. 1361, 1364, 51 L.Ed.2d 660 (1977). The 1889 Act, however, did not provide for the sale of economic units at fair market value or for the reasonable compensation to the Sioux. Instead, the land was divided in accordance with the public land grid regardless of the availability of water or accessibility and regardless of whether the 160-acre tracts being sold were suitable for farming or ranching. The 1889 Act fixed retrogressive statutory prices for the Indian-owned land—$1.25 per acre for the first three years, $.75 per acre for the next two years, and $.50 per acre for the next five years. After such ten-year period, the Federal Government was obligated to purchase the land for $.50 per acre. *Sioux Tribe of Indians v. United States,* 97 Ct.Cl. 391, 395 (1942). With such public notice that the land would ultimately be available for purchase at less than the initial low selling prices, settlers awaited the passage of time. At the end of ten years, 82.7 percent of the land (7,662,000 acres) was still unsold. GAO Report, Vol. 1, p. 411.[5]

In connection with the 1889 Act, Dr. Tanner also pointed out in her report, at p. 31, that:

> Hunger was a persuasive factor in gaining Sioux support for legislation that seemed to guarantee future rations. Although the treaty commissioners in 1889 promised that food supplies for the Sioux would not be diminished, rations were cut in half following the signing, adding to an accumulating list of grievances against the federal government.

Faced with radical and enforced changes in their way of life, some Sioux turned, in 1890, to a new form of religious experience,

---

**5.** The General Accounting Office Report submitted to the Court of Claims in *Sioux Tribe of Indians v. United States,* 105 Ct.Cl. 658, 64 F.Supp. 303 (1946), and in *Sioux Tribe of Indians v. United States,* 105 Ct.Cl. 725, 64 F.Supp. 312 (1946), is also part of the record in this case.

known as the "Ghost Dance Religion." Unnecessarily fearful that religious dancing meant preparation for war, the Federal Government quickly moved to suppress the new religion, including, in the case of the Sioux, the military occupation of their reservation by 3,000 troops. During the course of a formal surrender by Big Foote's band at Wounded Knee, gunfire broke out and the unseasoned United States Army troops followed up their instantaneous destruction of the Sioux warriors with the murder of women and small children, some pursued for a distance of two miles. Even the Federal Government's own expert witness, Mr. Woolworth, conceded that this slaughter of 370 Sioux in 1890 was an "atrocity."

The portion of the Great Sioux Reservation not placed in the public domain by the 1889 Act was divided into six reservations. As Dr. Tanner noted, "[t]he separated Sioux reservations were more accessible to illegal white encroachment, creating new Indian-white tension in the Dakota and northern Nebraska region." Then, from 1904 through 1913, the Government enacted seven statutes,[6] without the consent of any of the tribes as required by Article XII of the 1868 Treaty, opening all, or, at the very least, most, of the reservations for sale to settlers. In this fashion, the Federal Government destroyed the tribal land base.

Carrying out the policies of the General Allotment Act of 1887, 24 Stat. 388, as implemented on the Sioux reservations by seven statutes enacted between 1900 and 1910, the Federal Government divided the remaining tribal lands into individually-owned, 160-acre tract allotments.[7] The allotment system was totally alien to the Sioux tribal members, who had traditionally lived together in close-knit groups rather than on individual tracts of land separated by great distances. Furthermore, the allotment system was "misguided" in its application to Sioux country and, in the words of the defendant's expert witness, Mr. Woolworth, "hurt the Indians badly." According to Mr. Woolworth, the Government's allotment policy "did not recognize that many Indians would not or could not become farmers swiftly; and that they had neither the cultural heritage nor the training for a different life style."

The Federal Government had been aware, since at least the late 1870's, that most of the Sioux territory was unsuitable for farming due to climatic conditions and the relatively poor quality of the soil. Federal agents throughout the Sioux country reported the failure of the Sioux's early agricultural efforts due to these conditions. In fact, the land was fit only for stockraising, a use for which tracts of land far larger than 160 acres were required. The Sioux allotments, therefore, failed to provide an adequate means of support for their owners, even assuming maximum use of the land. Accordingly, once they received their allotments, many Indians applied for fee patents and sold their land at bargain prices in order to raise the cash they needed to survive. Other Sioux

---

6. *Rosebud Sioux Tribe:* Act of April 23, 1904, 33 Stat. 254; Act of March 2, 1907, 34 Stat. 1230; Act of May 27, 1910, 36 Stat. 448; *Lower Brule Sioux Tribe:* Act of April 21, 1906, 34 Stat. 124; *Cheyenne River Sioux Tribe:* Act of May 29, 1908, 35 Stat. 460; *Standing Rock Sioux Tribe:* Act of May 29, 1908, 35 Stat. 460; Act of February 14, 1913, 37 Stat. 675; *Pine Ridge Sioux Tribe:* Act of May 27, 1910, 36 Stat. 440.

7. The allotment program began in 1887 with the passage of the General Allotment Act, ch. 119, 24 Stat. 388. The General Allotment Act and its progeny effectively carved up the Sioux reservations, parceling out individual portions of reservation lands to tribal members. The remaining unallotted reservation lands, known as surplus lands, were often subsequently opened for non-Indian settlement. Although in part a good faith effort to encourage tribal self-sufficiency and in part a response to settlers increasing demands for more land, the allotment program failed dismally. The majority of Indian tribal allottees lost their land soon after receiving fee title. *See Solem v. Bartlett,* —— U.S. ——, 104 S.Ct. 1161, 1164, 79 L.Ed.2d 443 (1984); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 624–25, 97 S.Ct. 1361, 1382–383, 51 L.Ed.2d 660 (1977) (Marshall, J., dissenting). *See generally* Readjustment of Indian Affairs: Hearings on H.R. 7902 Before the House Comm. on Indian Affairs, 73d Cong.2d Sess. 428–89 (1934) (History of the Allotment Policy).

leased their property to white landowners and cattle syndicates, whose operations flourished while the Indians could maintain small herds at best. This development was hastened by the leasing to white ranchers of large amounts of tribal land on very advantageous terms—a process which the Federal Government actively promoted.

The allotment system thus fostered the further sale of Sioux lands, prevented the Sioux from establishing a cattle industry, and produced increased dependence upon Federal Government assistance. Following the allotments, the Federal Government, through such policies as forced fee patents, consciously promoted and achieved a substantial transfer of the remaining Sioux lands into non-Indian ownership. The Federal Government also applied state inheritance laws to Indian lands, creating a pattern of "fractionated" ownership, which made it impossible to develop the land profitably. In short, the allotment system imposed upon the Sioux by the Federal Government amounted to an economic and social disaster for them.

By the Act of March 3, 1863, 12 Stat. 744, the United States barred Indian tribes, including the plaintiff, from filing suit in the U.S. Court of Claims to obtain redress for past wrongs. When Congress enlarged the jurisdiction of the Court of Claims in 1887, the same ban against Indian tribal claims was carried forward. *See* Section 1 of the Tucker Act, March 3, 1887, ch. 359, 24 Stat. 505. In 1920, Congress finally allowed the Sioux to bring some of their grievances to the Court of Claims. Act of June 3, 1920, 41 Stat. 738. While 14 cases were initiated under the 1920 statutory authority, each was later dismissed, at least in part, because the jurisdictional statute was too narrowly drawn. *See, e.g., Sioux Tribe of Indians v. United States*, 97 Ct.Cl. 613 (1942), *cert. denied*, 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943).

During the late 1920's, and particularly following the publication by the Brookings Institution, in 1928, of Lewis Merriam's classic work, "The Problem of Indian Administration," the Federal Government came to recognize the failure of its Indian policies and began to change direction. The Indian Reorganization Act (I.R.A.) of June 18, 1934, 48 Stat. 984, for example, brought a halt to the allotment process, authorized the restoration of ceded but unsold tribal lands, and provided a mechanism for Indian tribes to adopt constitutions and corporate charters. For a brief period, up to about 1940, economic conditions on the Sioux reservations showed improvement. The I.R.A., however, did not reduce continued administrative bungling. Instead, it caused a new, debilitating form of factionalism. Thus, for the plaintiff, the Indian New Deal, while well meaning, also proved misguided, insensitive and short lived.

In 1942, the United States Army appropriated 343,188 acres within the Pine Ridge Reservation for an aerial gunnery range, forcing the rapid eviction of 125 Oglala Sioux families under inhumane conditions. During the 1950's and 1960's, the Army Corps of Engineers, as part of a dam construction program along the Missouri River, flooded out the river-bottom portion of four Sioux reservations—Crow Creek, Lower Brule, Cheyenne River and Standing Rock—resulting in the forced relocation of 494 additional Indian families and wholly disrupting the reservation economies. According to Mr. Bennett, who was for a part of that period the Commissioner of Indian Affairs, the site of each dam was intentionally selected by reference to the availability of Indian land. Further, during the "termination" era of the 1950's, Federal Government officials successfully encouraged Sioux allottees to dispose of their trust allotments.[8]

**8.** In 1953, Congress officially adopted a federal policy encouraging rapid assimilation of Indians into the dominant white culture by terminating the trust relationship between Indian Tribes and the Federal Government. *See* H.R. Con.Res. 108, 83 Cong., 1st Sess., 67 Stat. B132

(1953). During the termination era, Congress passed a series of acts severing its trust relationship with more than 100 Indian tribes or bands. Tribal lands either passed into private ownership, subject to state and local taxation, or were sold as part of the termination process with the

At the time of their first formal contact with the Federal Government, the Sioux were a healthy, powerful and fiercely independent people. With the advent of the reservation era and, in particular, after the Federal Government assumed responsibility for their welfare, health conditions among the Sioux experienced a precipitous decline—in material part because of a forced change in lifestyle, malnutrition, deplorable housing, and a lack of medical attention.

Despite declining health conditions on the Sioux reservations, which have been described as "pitiful," the Federal Government failed to assign a sufficient number of physicians to the reservations, and those physicians who were assigned found themselves hampered in their efforts by inadequate equipment and facilities. A number of children were too ill to attend school, and those, who managed to attend frequently, were made ill by the overcrowded and unsanitary conditions. These general conditions persisted into the 1930's.

Although the Federal Government has made efforts during recent years to improve medical treatment, sanitation and hospital care, health conditions among the Sioux remain today, as in generations past, far inferior to their non-Indian neighbors. Studies, performed in the 1940's through the 1960's, indicate that the problems of poor diet, unsanitary housing conditions, and inadequate medical facilities have persisted. In 1960, the Indian infant mortality rate was four times higher than among whites, and the mortality rate among young adults was three times higher than among whites. Even today, the quality of housing on the Sioux reservations is poor and, in some areas, inadequate sanitary facilities still create health problems. In sum, as Dr. Tanner observed, "under the reservation system, the Sioux changed from a healthy to a sickly people."

Under Article VII of the 1868 Treaty, *supra*, 15 Stat. at 637–38, the Federal Government promised that a house would be provided and a teacher employed for every 30 Sioux children "who can be induced or compelled to attend school * * *." During the next 20 years, this goal was never achieved, since the Federal Government failed to carry out its 1889 promise to increase appropriations for Indian education.

Moreover, the education which the Federal Government did provide Sioux children was often inadequate and misguided. Specifically, the Federal Government removed many children from their home environment, shipped them to off-reservation boarding schools, subjected them to both substandard facilities and brutal discipline, and kept them away from their families for years. While at school, the children also were forced to work for their own sustenance, frequently under the most harsh conditions. When the Sioux children were finally returned to their homes, they found that their educational training did not assist them in locating gainful employment and that their education had estranged them from the reservation community.

The Federal Government's record with on-reservation boarding and day schools has been no better. Especially in the early years, these schools were so small that, even with serious overcrowding, they could not accommodate all of the reservation children and were characterized by unsanitary and hazardous conditions. During the 1920's, the educational level of the Sioux was reported as far below the levels considered normal among white Americans. In 1937, the South Dakota Planning Board

---

proceeds distributed per capita. As a result, terminated tribes lost not only their land base but also a number of federal services previously arising from the trust relationship, including education, health care, housing and emergency welfare. Because termination also transferred jurisdiction to states and local governments, the affected Indian tribes lost their tribal sovereignty. In many cases, tribal governments were dissolved. The termination era officially ended when Congress passed the Indian Civil Rights Act of 1968, 82 Stat. 77, *codified at* 25 U.S.C. § 1301, *et seq.* While not directly terminated under the 1953 Act, the Sioux, like many other tribes during this era, were pressured to sell trust allotments and to relocate to urban areas. *See* F. Cohen, Handbook of Federal Indian Law 152–80 (1982 ed.)

stated that the percentage of illiteracy among the Sioux Indians was approximately 14 times that of the state's population as a whole.

Today, the low level of educational achievement, the high dropout rate, and the tragically high levels of alcoholism and suicide among Sioux students are common knowledge. A study, performed in 1970 at the Standing Rock Reservation, showed that 87 percent of the students were below the national average in reading vocabulary and 85 percent were below the national average in reading comprehension. At one high school, a 50 percent dropout rate was recorded. The dropout problem is particularly serious because studies have shown that there is a positive correlation between the Sioux's ability to maintain employment and their level of educational attainment.

In short, the Federal Government has not fully or fairly carried out its obligation to provide educational benefits for the Sioux.

One of the primary objectives of the Federal Government, in negotiating the 1868 Treaty, was to secure agreement of the Sioux to settle down as farmers on the Great Sioux Reservation. However, the land in the western half of South Dakota was not suitable for grain farming in plots of 160 acres. Even if the land was suitable for grain farming in plots of 160 acres, the Federal Government's periodic reductions of the Sioux reservations so unsettled the Sioux people and so decimated their land base as to preclude the establishment of a permanent substitute for their original buffalo-hunting economy. Furthermore, by repeatedly leaving their status and location uncertain, the Federal Government discouraged the Sioux from exercising any initiative or undertaking any self-help efforts.

Over the years, the Federal Government's acts and policies evidence a total disregard for rebuilding the Sioux economy. The gutting of four Missouri River reservations, during the 1950's and 1960's, has already been noted. Other examples, of which the following are merely illustrative, include: (1) in 1889, the Sioux were summoned to their agencies' headquarters and were required to remain in council for weeks, resulting in the destruction of their crops; (2) after passage of the 1889 Act, the necessary boundary surveys were not made promptly so that no one knew what land would be retained for the Indians and could thus be improved; (3) the Federal Government also broke its promise to allow a number of Sioux to transfer from the Rosebud agency to the Pine Ridge agency; (4) in addition to breaking reservation land-holdings into uneconomic 160 acre plots, the allotment process, during the early 1900's, required many Sioux to relocate once again, costing many of them their homes and garden plots and, at Rosebud, a promising cattle-ranching operation; (5) after the Sioux had developed a profitable local freighting business, the Federal Government purchased the trucks, hired non-Indian drivers, and eliminated the enterprise; and (6) the Bureau of Indian Affairs used funds appropriated under the 1956 Adult Vocational Training Act, Act of Aug. 3, 1956, ch. 930, 70 Stat. 986, codified as amended at 25 U.S.C. §§ 309–309a (1982), to subsidize the relocation of Sioux families to urban centers, rather than for on-reservation employment as intended by Congress.

Aside from a short-lived assistance program during the late 1930's, the programs imposed by the Federal Government upon the Sioux had the effect, if not the purpose, of destroying the Sioux economy.

Beginning with the 1868 Treaty, the policy of the Federal Government has been to undercut the natural Sioux leadership, to crush the Sioux society, and to eradicate the Sioux culture. Thus, federal representatives, in dealing with the plaintiff, have wholly ignored the "tiospayes," the kinship groups which are the basic unit of Sioux society. For years the Federal Government banned Sioux dances, religious ceremonials, and other native practices. Indian students were removed from their home environment, were allowed to speak only English, were given English names, and were prohibited from wearing long hair or

native dress. The crudest possible tactics were sometimes used to force the Sioux to relinquish their customs. One agent, for example, reported that he would furnish neither work nor rations to Indians who refused to cut their hair. Even in the more enlightened days of the Indian New Deal, the Federal Government foisted upon the Sioux a political system which was alien to their customs and traditions. The confusion in cultural values caused by the Federal Government's policies has produced a great personal and social disorganization among the Sioux.

## III.

### *Discussion*

Section Two of the Indian Claims Commission Act, 25 U.S.C. § 70a (1976), granted the Commission, and now this Court, considerable discretion regarding gratuitous offsets. In particular, the Act provides that:

> The Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to claimant, * * *.

25 U.S.C. § 70a (1976).

This course of dealings provision allows the defendant to offset historical gratuitous expenditures made on the plaintiff's behalf from any judgment that the plaintiff is ultimately awarded. However, since this provision is addressed to this Court's good conscience, before any gratuities are awarded, this Court must first thoroughly consider whether the Federal Government's conduct during its entire course of dealings with the plaintiff was sufficiently fair and honorable to merit the granting of gratuitous offsets. Based upon the discretion contained in this "course of dealings" provision, prior tribunals have denied gratuities both in part, *United States v. Pueb-*

*lo de Zia,* 200 Ct.Cl. 601, 620–21, 474 F.2d 639, 650–51 (1973), and in whole, *United States v. Assiniboine Tribes of Indians,* 192 Ct.Cl. 679, 696, 428 F.2d 1324, 1333 (1970).

The Court of Claims, in the instant case, acknowledged this discretion in directing this Court to review the entire course of dealings between the Federal Government and the Sioux Tribe by stating the following:

> The events involved in this case cover a much longer period than the 3 years upon which the Commission exclusively focused. The treaty itself was negotiated and ratified in 1868 and 1869; its background goes back a number of years before that; and the payments that the government wants to treat as gratuitous offsets were made well into the twentieth century.

> This court has stated that the government is entitled to gratuitous offsets if the entire course of dealings between it and the Indians warrants such action. * * * In the present case, the Commission did not examine the entire course of dealings between the United States and the Sioux but instead considered only the dealings in the relatively brief period 1875–77. The Sioux already have been awarded full compensation for the government's improper action in those years in taking the Black Hills from them. * * *

> Paragraph 3 of the Indian Claims Commission Act does not permit the Commission to deny gratuitous offsets solely on the basis of a relatively small portion of the total dealings between the United States and the Indians. Consideration of the entire course of dealings might have led the Commission to conclude that gratuitous offsets should be allowed. The present case, therefore, is unlike *United States v. Assiniboine Tribes,* 192 Ct.Cl. 679, 428 F.2d 1324 (1970). There we upheld the Commission's denial of gratuitous offsets where the Commission stated that its decision was based "upon review of the entire course of dealings

between the parties...." *Assiniboine Tribe of Indians v. United States*, 21 Ind.Cl.Comm. 310, 312 (1969).

C. Since we conclude that the Commission erred in refusing to consider reducing the award by any payments on the claim or gratuitous offsets, the case must be remanded to the Trial Division to determine whether the award should be reduced. In so doing, we do not indicate any view on the application of particular payments to the cession of particular lands, or on the extent, if any, to which the award should be reduced. Those are matters for the trial judge to determine in the first instance. We hold only that the Commission erred in totally barring consideration of those items.

*United States v. Sioux Tribe, supra*, 222 Ct.Cl. at 432–33, 616 F.2d at 491–92 (Citations omitted).

In keeping with this directive, the Court has thoroughly examined the wealth of historical evidence reflecting the course of dealings. Four days of trial testimony, thousands of pages of historical evidence, and special reports compiled by expert witnesses all indicate that the Federal Government's conduct during the course of dealings was on balance, dishonorable and unfair. Thus, in the exercise of its discretion, this Court will not allow the Federal Government to present, in future proceedings, any evidence of "over the course" gratuities as offsets to the interlocutory land valuation award fixed at $43,949,700. As discussed in the factual section of this opinion, a review of historical dealings between the Federal Government and the Sioux Tribe reveals that the encounters between these two profoundly different cultures often resulted in unfairness and tragedy.

This is not to say, however, that the Federal Government, at all times, acted unfairly. Indeed, the record reflects instances in which the Federal Government directly attempted to benefit the Sioux tribal members. During the Indian New Deal period, the passage of the Indian Claims Commission Act in 1946 and, more recently,

through the policy of "Indian self-determination," the Federal Government has made an effort to halt the decline in the fortunes of the Sioux people. Much of this, however, has come far too late.

The tragic decline of the Sioux Tribe from a powerful and independent Indian nation in 1868 to their present state of poverty and dependence is, however, the direct consequence of other, more pernicious Federal Governmental acts and policies implemented over the course of some 117 years of this country's history. The entire course of dealings between the United States and the Sioux is marked, on the part of the Federal Government, primarily by broken promises, by the rapacious acquisition of land, by the repeated sacrifice of Sioux rights to non-Indian interests, and by the oppression of Sioux society. The record, as a whole, and on balance, furnishes no justification for the allowance of gratuitous offsets to be applied against the plaintiff's land valuation award.

### CONCLUSION

For the reasons stated above, this Court will not allow the defendant, in future proceedings, to submit evidence of "over the course" gratuities as offsets to the plaintiff's interlocutory land valuation award of $43,949,700. Thus, the plaintiff's motion for summary judgment is hereby granted, and the defendant's cross-motion for summary judgment is hereby denied.